UNITED STATES, Appellee,

v.

Willie C. CLARK, Sergeant First Class, U.S. Army, Appellant.

No. 66,582.
CM 8901402.

U.S. Court of Military Appeals.

Argued March 4, 1992.

Decided Sept. 30, 1992.

For Appellant: *Captain Edward T. Keable* (argued); *Lieutenant Colonel James H. Weise* and *Major James M. Heaton* (on brief); *Captain Emmett G. Wells.*

For Appellee: *Captain Samuel J. Smith, Jr.* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Daniel J. Dell'Orto, Major Kenneth T. Grant* (on brief); *Captain Timothy J. Saviano.*

## Opinion

CRAWFORD, Judge:

 Contrary to his pleas, appellant was found guilty by a military judge of rape,[1] in violation of Article 120, Uniform Code of Military Justice, 10 USC § 920. He was sentenced to a dishonorable discharge, confinement for 7 years, and reduction to the lowest enlisted grade. The convening authority approved the sentence, and this was affirmed by the Court of Military Review. 32 MJ 606 (1991). We granted review to determine "whether the evidence of force and lack of consent was [legally] sufficient ... to support a finding of guilty to rape."

### I

 Our standard in testing for legal sufficiency of the evidence is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Accordingly, we will view the evidence against this standard in determining sufficiency of the evidence of force and lack of consent.

To start, we adopt the excellent recitation of facts set forth by the Court of Military Review, and for clarity, we will quote those facts pertinent to our discussion. During October 1988, Private (PVT)

I attended basic training at Fort Jackson, South Carolina. Private I graduated from high school in June of 1988 and was exposed to the military environment for the first time while attending basic training at Fort Jackson. On October 27, 1988, Private I, still of trainee status, was assigned kitchen duties at the dining facility under the supervision of appellant, a sergeant first class. Prior to October 27, PVT I had never met appellant. He ordered PVT I "to clean an area where kitchen equipment was to be turned-in." Thereafter, the following events transpired:

> PVT I testified that the appellant had made personal remarks to her during the duty day to the point where she asked a fellow male trainee to assist her because the appellant both "scared" her and "he was weird." Later, the appellant came to the area and ordered her to accompany him to a storage shed to get cleanser so the cleaning job could be done correctly. PVT I reluctantly followed the appellant outside to a shed which was out of view of anyone in the training unit.

32 MJ at 607.

Appellant is 5'8" in height and weighs approximately 210 pounds. In contrast, PVT I is 5'5" in height and weighs approximately 120 pounds. Upon reaching the shed appellant unlocked the door; motioned PVT I inside a small, pitch black room with brick walls and a metal door; entered behind her, and closed the door. Once inside, the following sequence of events unfolded:

> The appellant asked, "[W]here are you," reached for PVT I, grabbed her arm, and kissed her. PVT I did not return his kiss and "stiffened her body." The appellant then unbuttoned his trousers, exposed his penis, took PVT I's hand and placed it on his penis, and rubbed it back and forth. He then directed her to take off her trousers. She unbuttoned only the

---

1. The charge sheet reflects "None" in the section for "instructions." In a capital case this means the referral is capital. There must be a specific statement in the instructions that the case is referred as noncapital for the death penalty to be removed as the maximum punishment. Because the military judge specifically stated his "understand[ing] the case has been referred as a noncapital case," trial by judge alone was permissible. *See* Art. 18 (3d sent.), Uniform Code of Military Justice, 10 USC § 818.

top two buttons, hoping that he would be unable to get her trousers down and would stop. But he was able to pull her trousers down below her buttocks and attempt intercourse. Being unsuccessful, he ordered her to turn around and bend over. The appellant then penetrated her vagina and continued intercourse for "what seemed like forever." During the intercourse the appellant grabbed PVT I's breast roughly.

At this point, PVT I made her first verbalization, telling "the appellant to stop by stating, '[S]omeone may come.' The appellant withdrew, checked outside the door, and let PVT I pull up her trousers and leave." 32 MJ at 608.

PVT I obediently returned to her work station where the same male trainee who had previously assisted her noticed that she was crying and almost hysterical. The following events occurred after the rape:

Later, the appellant approached PVT I and told her not to tell anyone what had happened or they both would be in trouble, and that the next time she was on KP [kitchen police] they would have sex again. Despite this caution and because of the repeated questioning by a friend at the billets upon that friend's discovery of red marks on PVT I's chest and back, PVT I finally reported the rape. A subsequent medical exam confirmed that she had had sexual intercourse but did not substantiate the testimony of two female trainees concerning the red marks. Thereafter, PVT I refused to go to the mess hall to eat until ordered to do so. She also experienced nightmares that required the comfort of her friends in the billets.

32 MJ at 608 (footnote omitted). Although "appellant's version of what transpired is starkly different," he did admit to having sex with a trainee to the civilian supervisor at the dining facility. *Id.* at 608.

## II

The elements of rape as set forth in the Manual for Courts–Martial, United States, 1984, are that: (1) "the accused committed an act of sexual intercourse with a certain female"; (2) "the female was not the accused's wife"; and (3) "the act of sexual intercourse was done by force and without her consent." Para. 45b(1), Part IV. The only challenged element is the third one, and the challenge involves an interpretation of the term "by force and without her consent."

The Manual for Courts–Martial explains the term as follows:

Force and lack of consent are necessary to the offense. Thus, if the female consents to the act, it is not rape. The lack of consent required, however, is more than mere lack of acquiescence. If a woman in possession of her mental and physical faculties fails to make her lack of consent reasonably manifest by taking such measures of resistance as are called for by the circumstances, the inference may be drawn that she did consent. Consent, however, may not be inferred if resistance would have been futile, where resistance is overcome by threats of death or great bodily harm, or where the female is unable to resist because of the lack of mental or physical faculties.In such a case there is no consent and the force involved in penetration will suffice. All the surrounding circumstances are to be considered in determining whether a woman gave her consent, or whether she failed or ceased to resist only because of a reasonable fear of death or grievous bodily harm.

Para. 45c(1)(b).

We agree with the Court of Military Review that force and lack of consent could be found by a reasonable trier of fact beyond a reasonable doubt, but we disagree as to the legal theory which applies.

The court below found actual force for three reasons. First, because appellant ordered PVT I to accompany him, an order which was her duty to obey; second, because he confined PVT I in a small shed with brick walls and a metal door, in an isolated area; third, because he "grabbed" her and kissed her, taking her hand and rubbing it on his penis, and "grabbed her breast roughly" as the intercourse pro-

gressed, which was evidenced by the red marks observed on her chest and in the area of her back where her bra strap was located.

The court below also found that "it was reasonable for PVT I to fear for her life, to have a reasonable fear of grievous bodily injury, and to believe that resistance would be futile," 32 MJ at 610, because "PVT I testified that she was 'scared' of the appellant and that she passively resisted because to do more would have caused the appellant to hurt her"; because "PVT I was ordered by her superior noncommissioned officer ... to accompany him and he directed her movements"; because "appellant made sure that the place of the rape was isolated and out of the view of other trainees"; because the rape occurred in "a 'pitch' black room built of bricks with a metal door"; and because appellant is "a large man who positioned himself between the door and his victim, and he 'grabbed her' and kissed her." *Id.* at 609–10.

There are numerous cases supporting the legal sufficiency of these findings. *See generally United States v. Bradley,* 28 MJ 197, 200 (CMA 1989) ("We hold ... that this military relationship ... created a unique situation of dominance and control where explicit threats and display of force by the military superior were not necessary."); *United States v. Williamson,* 24 MJ 32, 34 (CMA 1987) ("Resistance is not required [for rape] ... when it would be futile; the *totality* of the circumstances, including the level of resistance, are to be considered by the factfinders in determining whether consent was lacking."); *United States v. Hicks,* 24 MJ 3, 6 (CMA 1987),

*cert. denied,* 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 55 (1987) ("The existence and reasonableness of the victim's fear of bodily harm under the totality of the circumstances are questions of fact."); *United States v. Jackson,* 25 MJ 711 (ACMR 1987) (lack of consent found in victim's evasive actions to advances by platoon sergeant who was much larger physically than victim), *pet. denied,* 27 MJ 1 (1988); *United States v. McFarlin,* 19 MJ 790, 794 (ACMR) (lack of consent found in the "passive acquiescence prompted by appellant's superior rank and position"), *pet. denied,* 20 MJ 314 (CMA 1985).

These findings do not, however, show that actual force was used in the rape, but rather they are pertinent to an application of the doctrine of constructive force. In those statutes, like the Uniform Code of Military Justice, where force is necessary to prove lack of consent, the emphasis of an inquiry into actual force has traditionally been defined in terms of the conduct of the victim, the definition being based on the amount of resistance exerted during the attack. *See generally,* Note, *Recent Statutory Developments in the Definition of Forcible Rape,* 61 Va. L.Rev. 1500 (1975).[2]

The doctrine of constructive force is used in those situations when no force is needed to accomplish the rape beyond what is involved in the act of intercourse itself because the victim does not, or ceases to, resist because of a reasonable fear of death or grievous bodily harm. In order to apply the doctrine of constructive force, a court must find that "resistance would have been

2. The Model Penal Code [hereinafter MPC] sets forth a comprehensive restatement of the crime of rape which shifts the focus from the victim's conduct to the amount of force or coercion applied by the assailant. In order to be guilty of rape in the first or second degree, a showing must be made that the assailant "compel[led] her to submit by force or by threat of imminent death, serious bodily injury, extreme pain or kidnapping, to be inflicted on anyone." In order to be guilty of rape in the third degree (gross sexual imposition), a showing must be made only that the assailant "compel[led] her to submit by any threat that would prevent resistance by a woman of ordinary resolution."

American Law Institute, *Model Penal Code and Commentaries,* Part II, Rape and Related Offenses § 213.1(1)(a) and (2)(a) at 274–75 (1980).

The exception to this general rule is found in the drafters' comment that "compel[s] to submit" does require more than "a token initial resistance." MPC § 207.4, Comment at 246–47 (Tent. Draft No. 4, 1955). Nevertheless, in light of the mandate of Section 1.02(3), MPC, Part I at 13 (1985), that Code provisions should be construed not restrictively but "according to the fair import of their terms," the term "threat" is encompassed by an implied threat inherent where a woman is trapped in a dangerous situation of the accused's making.

futile," resistance was "overcome by threats of death or great bodily harm," or "the female is unable to resist because of the lack of mental or physical faculties." Para. 45c(1)(b).

Use of the doctrine of constructive force to satisfy an element of the crime of rape dates back at least as far as 1917, when the Manual for Courts–Martial provided: "Force, *actual or constructive,* and a want of consent are indispensable in rape, but the force involved in the act of penetration is alone sufficient force where there is in fact no consent." Manual for Courts–Martial, United States, 1917, at 251: Ninety–Second Article of War, Part II (emphasis added). Indeed, Colonel Winthrop discussed the topic of force necessary to accomplish rape in 1886, saying: "It is not essential that the force employed consist in physical violence; it may be exerted in part or entirely by means of other forms of duress, or by threats of killing or of grievous bodily harm or other injury, or by any moral compulsion." W. Winthrop, *Military Law* 971 (1886), *reprinted* in W. Winthrop, *Military Law and Precedents* 677–78 (2d ed. 1920 Reprint). The cases cited by Winthrop in support of this proposition include: *Pleasant v. State,* 13 Ark. 374 (1853) ("If the woman submitted from terror, or the dread of greater violence, the intimidation becomes equivalent to force.") and *Strang v. People,* 24 Mich. 1 (1871) ("If the jury are 'satisfied that her will was overcome by fear of the accused,' a conviction will be proper.").[3] Winthrop (1886), *supra* at 971 n.4; (1920) 678 n.82.

We are satisfied that the doctrine of constructive force applies in this case due to the specific findings of fact the court below used to find actual force, *i.e.,* that it was reasonable for PVT I to fear for her life, to fear grievous bodily injury, and to believe that resistance would be futile.

We join wholeheartedly in the holding of the court below "that the appellant cannot create by his own actions an environment of isolation and fear and then seek excusal

from the crime of rape by claiming the absence of force," 32 MJ at 610, especially where, as here, passive acquiescence is prompted by the unique situation of dominance and control presented by appellant's superior rank and position.

The decision of the United States Army Court of Military Review is affirmed.

Judge COX concurs.

WISS, Judge (concurring in part and in the result):

I agree with the disposition reached by the lead opinion and with most of its language. I disagree, however, with the end of the paragraph immediately preceding the decretal paragraph that reads, "especially where, as here, passive acquiescence is prompted by the unique situation of dominance and control presented by appellant's superior rank and position." 35 MJ at 436. That language is far too all-inclusive.

Hypothetically, for instance, if a man of superior rank and position had sexual intercourse with a subordinate woman and where that woman in no way "make[s] her lack of consent reasonably manifest by taking such measures of resistance as are called for by the circumstances," *see* para. 45c(1)(b), Part IV, Manual for Courts–Martial, United States, 1984, there is an inference that the victim *consented.* See *United States v. Bonano–Torres,* 31 MJ 175 (CMA 1990); *United States v. Watson,* 31 MJ 49 (CMA 1990). In other words, superior rank and position of the male does not translate *automatically* into lack of consent of the female. If it did—as this language in the lead opinion might be read to imply—then all of the significant number of sexual fraternization cases that reach this Court could conceivably come here as *rape* convictions rather than fraternizations.

Of course, other circumstances relative to passive acquiescence are present here,

---

**3.** Rather than "resort[ing] to the fiction of 'constructive force,' " Prof. Perkins suggests: "A better analysis is to recognize that the requirement of force is simply a means of demonstrating

that the unlawful violation of the woman was without her consent and against her will." R. Perkins & R. Boyce, *Criminal Law* 211 (3d ed. 1982).

so I agree with the remainder of the opinion and with the disposition; but the language quoted earlier from the opinion might be read too broadly, and so I do not associate with it.

SULLIVAN, Chief Judge (concurring in the result):

The lead opinion's exposition of the doctrine of constructive force and its absorption of the doctrine of implied lack of consent is troublesome. I cannot join it.

Judge Cox, writing recently for this Court in *United States v. Palmer*, 33 MJ 7, 9 (CMA 1991), more precisely defined this doctrine as follows.

In the law of rape, various types of conduct are universally recognized as sufficient to constitute force. The most obvious type is that brute force which is used to overcome or prevent the victim's active resistance. Physical contact, however, is not the only way force can be established. *Where intimidation or threats of death or physical injury make resistance futile, it is said that "constructive force" has been applied, satisfying this element. See United States v. Bradley*, 28 MJ 197 (CMA 1989). Closely related to these is the situation in which the victim is incapable of consenting because she is asleep, unconscious, or lacks mental capacity to consent. In such circumstances, the force component is established by the penetration alone. *See generally* B. Morosco, *The Prosecution and Defense of Sex Crimes* § 1.02[2] (1990); R. Perkins and R. Boyce, *Criminal Law*, Ch.2, § 5D at 209–14(1982); 3 *Wharton's Criminal Law* §§ 287–89 (C. Tortia 14th ed. 1980).

Military law conforms with these principles. Para. 45c(1)(b), Part IV, Manual for Courts–Martial, United States, 1984, set out in n.3 of this opinion. *See also United States v. Williamson*, 24 MJ 32 (CMA 1987); *United States v. Hicks*, 24 MJ 3 (CMA), *cert. denied*, 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 55 (1987).

(Emphasis added.) However, I agree with the lead opinion that sufficient evidence was admitted in this case to meet the force element of Article 120, Uniform Code of Military Justice, 10 USC § 920. *See United States v. Bradley, supra* at 200.

As for the related issue of lack of consent (*id.* at 201), I also am satisfied that sufficient evidence was admitted on this point. In this regard, I note that the victim testified that she did not consent to sexual intercourse with him, that she stiffened her body, and did not return his kiss. In view of other evidence in this case noted earlier, I would affirm.

GIERKE, Judge (dissenting):

I agree with the lead opinion that the evidence is insufficient to prove actual force. I disagree with the majority's holding that the evidence is sufficient to prove constructive force. The third element of rape, "[t]hat the act of sexual intercourse was done by force and without her consent," para. 45b(1)(c), Part IV, Manual for Courts–Martial, United States, 1984, is a compound element. Its two sub-elements, force and lack of consent, are not the same, although evidence proving force usually will prove lack of consent. In this case I find the record devoid of evidence of force, actual or constructive, and devoid of evidence that PVT I manifested her lack of consent.

### I. The Evidence

Private I testified that she reported for duty as a "KP" shortly before noon on October 27, 1988. Appellant "was in charge of all the" KPs. PVT I did not know and had not worked for appellant previously. While the other KP supervisor "wasn't very nice" and "yelled a lot," appellant was "bubbly." PVT I found appellant "weird and creepy" because "[h]e was just too friendly." He smiled a lot and asked PVT I "personal questions, where [she] was from, [her] MOS, did [she] like it there, what [she] did...."

Late in the day, but before dark, appellant ordered PVT I to clean a storage closet. About 10 minutes later she asked a

friend, Private Tart, to check on her periodically because she was afraid as she didn't think she should be there alone. PVT I told Tart that appellant "scared" her "and that he was weird."

PVT I began "cleaning the walls with water and trying to get the dirt off." Appellant returned after about 10 minutes and asked what they were using to clean the walls. PVT I responded that it was "just water." Appellant told PVT I "to follow him to get some pine oil." PVT I followed appellant to a closet in the dining hall, but they found no pine oil there.

Appellant then told PVT I "[t]o follow him" outside. PVT I "walked behind" appellant to an outside storage shed. Appellant opened the door of the shed and motioned PVT I to go inside. Appellant entered the shed, which was unlighted, and "closed the door." PVT I testified that she said nothing about the darkness and just "felt around" for the pine oil because she "was afraid." Appellant asked PVT I where she was, but PVT I did not reply. Appellant "reached for" PVT I, turned her around, pulled her toward him, and kissed her. PVT I did nothing and said nothing. Asked why she did nothing, she responded, "I was afraid." Asked what she was "afraid of," she responded, "He would hurt me."

Appellant then "took his pants down" and placed PVT I's hand "on his penis." Then appellant told PVT I "to take [her] pants down." PVT I testified that she unbuttoned only the two top buttons, thinking that appellant would be unable "to get them down" and "he would stop." PVT I said that she did not "think about running or screaming," because appellant "was in front of the door." PVT I explained, "I didn't want to get hurt. I just wanted to get out of there alive."

Appellant finished unbuttoning PVT I's pants and attempted to have intercourse, but he was unable because "[h]e was too fat." Appellant then told PVT I "to turn around and bend over"; she complied. Appellant then had intercourse with PVT I, "roughly" fondling PVT I's breast during the intercourse. After a period of time that "seemed like forever," PVT I said, "Someone may come" and pulled away. Appellant immediately stopped, "checked" outside the door, and let PVT I leave. PVT I returned to the dining hall. A short time later appellant told her that he "hoped" that she would not tell anyone because they both could "get in trouble" and that "the next time" she had KP they could "do it again."

On cross-examination, PVT I admitted that she was sexually experienced and had told another man "no" when she did not want to have sex. She stated that appellant never threatened her or coerced her. She said nothing to appellant when he began his advances, but she "stiffened up and actions speak louder than words." She testified that she did nothing to fight off appellant because she "was scared" of what "would happen if" she resisted.

PVT Tart, who was working with PVT I at the time appellant told her to follow him to get pine oil, additionally noted the following about appellant: 1) "KP [kitchen police] sergeants" were not "nearly as strict as [the] drill instructors"; 2) appellant seemed more "laid back" than the other sergeants; 3) appellant had "always been friendly" that day; and 4) when he approached PVT I to have her follow him, he spoke in a "friendly" tone and "never raised" his voice.

## II. Constructive Force

The lead opinion holds that PVT I's "passive acquiescence" was "prompted by the unique situation of dominance and control" created by her military relationship with appellant which justifies a finding of constructive force. 35 MJ at 436, I disagree with this holding, because there is no evidence that their military relationship was operative in PVT I's decision to allow appellant to have sexual intercourse with her.

This Court has extended application of the constructive-force doctrine to rape cases involving military relationships, but only when the accused sufficiently exploited the military relationship itself to exert a

psychologically intimidating presence that could imply a threat of death or bodily harm. *See United States v. Bradley*, 28 MJ 197 (CMA 1989) (drill sergeant of the victim's husband confronted the victim in a secluded trailer, threatened to take disciplinary action against the victim's boyfriend if she did not have sex with him, alternated a loud and demanding voice with reasonable civilian conversation, and employed language directly exploiting his status as a drill instructor); *United States v. Hicks*, 24 MJ 3 (CMA) (section leader of the victim's boyfriend first met and confronted the victim in area that was unfamiliar to her; created a coercive atmosphere by threatening to report her boyfriend; spoke in a commanding, authoritative voice; and indicated an intent to use whatever force was necessary to have sexual intercourse with the victim), *cert. denied*, 484 U.S. 827, 108 S.Ct. 95, 98 L.Ed.2d 55 (1987).

Likewise, the concept of constructive force has been applied to rape cases involving parent-child relationships, but only where the evidence clearly indicated that the relationship itself was an operative fact. As we have said:

> To recognize that a parent or authority figure *can* exert a moral, psychological, or intellectual force over a child is merely to recognize the obvious. It is equally obvious, however, that all children do not invariably acquiesce to parental will. The questions thus remain: Was the child forced? and, Did the child consent? "Compulsion of parental command" never becomes an alternate test. If operative, however, it *may* establish that the child was forced and that consent was lacking.

*United States v. Palmer*, 33 MJ 7, 10 (CMA 1991) (footnote omitted). *See United States v. Rhea*, 33 MJ 413, 425 (CMA 1991) (case remanded to determine "whether the 'subtle and psychological' effects of" the accused's relationship with his stepdaughter during her later teenage years were adequate "to constitute 'constructive force'" necessary to prove rape).

These cases clearly indicate that proof of the *effect* of appellant's duty relationship with PVT I, not just the fact that it existed, is necessary to prove constructive force. In the instant case, a military relationship existed between appellant and PVT I, but no evidence was presented indicating that this relationship was *operative* in PVT I's "passive acquiescence" to sexual intercourse with appellant or that appellant exploited his status as her supervisor to make her have sex with him. While PVT I was ordered to accompany appellant to the shed ostensibly to get pine oil, PVT I never testified or implied that she later submitted to sexual intercourse under compulsion of military command, and she never indicated that appellant's rank played a role in her fear of death at the time. By PVT I's own admission, appellant never threatened or coerced her, and never placed her "under duress." I cannot join the majority because I believe that a finding of constructive force is unsupported by the record in this case and unwarranted by our prior decisions.

### III. Lack of Consent

Private I was an 18–year–old female soldier-trainee, who was in full command of her mental and physical faculties, had a sexual history apart from this incident, and understood that saying "no" could have a chilling effect upon a sexually aggressive man. Yet, PVT I never communicated a refusal to engage in sexual activity with appellant. She passively acquiesced to both foreplay and sexual intercourse with appellant without so much as a verbal complaint, whimper, gesture, or affirmative evasive action. She never cried, struggled or protested while in appellant's presence. Whatever signal she may have thought she provided by the stiffening of her body when appellant first kissed her became lost once PVT I actually began cooperating in foreplay without complaint or evasion by allowing appellant to place and move her hand on his penis, by starting to unbutton her trousers, and by turning around and bending over upon appellant's request after she knew he was attempting to have sexual intercourse with her.

Unlike other sexual offenses or violent crimes, rape requires proof of lack of consent as an element of that crime; consent is not merely an affirmative defense.* Proof of lack of consent in a rape charge requires "more than mere lack of acquiescence" where resistance would not "have been futile" or is not "overcome by threats of death or great bodily harm." Para. 45c(1)(b), Part IV, Manual, *supra*. If "more than mere lack of acquiescence" is required, then certainly mere "passive acquiescence" to sexual intercourse cannot, by itself, prove lack of consent.

The lead opinion holds that PVT I's consent could not be inferred because her belief that any resistance would be futile was a reasonable one. But how so? A rape victim's fear must stem from some articulable, calculated conduct of her attacker. As we stated in *Bradley:*

> The prosecution cannot convict a person of rape simply on the basis that the victim genuinely believed resistance would be futile. Additionally, it must show the conduct of the accused and other circumstances which would lead a reasonable person to reach the same conclusion. Such an honest and reasonable belief by the victim eliminates the requirement of showing physical force beyond that required for penetration. It does not eliminate the requirement of showing the express or implied use of constructive force in the first instance.

28 MJ at 201 n. 2 (citations omitted). The record simply lacks any evidence that appellant's conduct preceding intercourse was reasonably calculated to give rise to a fear on PVT I's part to the extent she would be unable to resist sexual intercourse with him.

Appellant supervised PVT I on the day of the incident, but he had no prior or ongoing supervisory relationship with PVT I and never spoke to her in a domineering manner. The evidence does not indicate, and PVT I did not articulate, any valid reason or any particular thing that the "friendly" but "weird and creepy" appellant did that made her so afraid that she could say or do *nothing* to attempt to stop appellant's sexual advances. Although appellant had just met PVT I that day, he was certainly no stranger who confronted PVT I for the first time in the shed. The Government offered no evidence of any past experience that could indicate that PVT I had reason to fear appellant would kill or beat her if she told him to cease and desist.

Private I's claimed fear of appellant began when she was ordered to clean the storage room, while she still thought he was a "nice guy." PVT I testified that appellant changed from a "nice guy" to someone frightening in the storage shed, but she could not describe what frightened her. Absent any evidence of intimidating conduct, PVT I had no reason to believe that appellant's sexual advances made him into a dangerous man who could be set off by any hint of resistance. Moreover, appellant did nothing indicating that he intended to forcibly overcome PVT I's will to resist. In fact, appellant's actions were totally inconsistent with a man bent on having sexual intercourse by force; he stopped having sexual intercourse immediately and without protest once PVT I made her first affirmative attempt to have him stop.

The "isolation and fear" that the lead opinion claims appellant created by his size and his order for PVT I to go with him to a small, dark, isolated shed where she was "confined" is not supported by the record. The evidence clearly indicates that PVT I had an unexplained fear of appellant *prior* to being told to follow him to the shed. Moreover, appellant's order to follow him could not have been calculated to increase PVT I's fears, and it should not have. The

---

* The lead opinion, 35 MJ at 435, cites *United States v. McFarlin,* 19 MJ 790 (ACMR), *pet. denied,* 20 MJ 314 (CMA 1985), for the proposition that lack of consent could be found in the "passive acquiescence prompted by appellant's superior rank and position." *Id.* at 794. However, *McFarlin* was not a rape case and involved a question whether honest and reasonable mistake of fact was raised by the evidence.

evidence does not indicate that PVT I ever expressed her fears to appellant in any way or show that appellant did any more than lead PVT I to believe she was going to the shed to obtain cleanser after they could not find any in the broom closet. Where a victim does not manifest her lack of consent by word or deed, she "cannot simply say, 'I was scared,' and thus transform an apparent consent into a legal non-consent." *Farrar v. United States*, 275 F.2d 868, 876 (DC Cir.1960).

Furthermore, there was nothing intrinsic about the isolation of the shed or appellant's size that would make a reasonable woman fear for her life. The supply shed was not in an area totally unfamiliar to PVT I. It was located adjacent to a loading bay connected to the dining facility where PVT I had been working and could not be locked from the inside. Appellant's order to have PVT I follow him to the shed did nothing to create the impression that he was a person who would use whatever force was necessary to have sex with PVT I. Absent any threats, coercion, use of weapons, or intimidating behavior preceding the intercourse, the fact that appellant was larger than PVT I and that the shed right outside of her work area was small and dark could not possibly cause a reasonable woman to consider *any* resistance to be futile. Men are usually larger than women. People rarely engage in sexual intercourse in well-lit rooms with witnesses. Unwanted sexual advances from a non-stranger (even a military superior), untainted by any threats, coercion, or force, should evoke more of a negative response than mere passive acquiescence.

Never before has this Court affirmed a rape conviction where an adult female in full possession of her mental and physical faculties has been so "passive" in allowing foreplay and sexual intercourse in the absence of any force or threat of force. *See, e.g., United States v. Bonano–Torres*, 31 MJ 175 (CMA 1990) (reversal of rape conviction upheld where specialist victim permitted her sergeant co-worker to have sexual intercourse with her to stop his persistent harassment to do so). *Cf. United States v. Bradley, supra* (victim's lack of consent exhibited through crying, begging, pleas to stop and minor physical resistance).

Sexual intercourse between adults is not an inherently criminal act. Although rape is a general-intent crime, it nevertheless requires proof that the accused intended to have sexual intercourse without the woman's consent. As part of proving the requisite *mens rea*, the prosecution must show that the perpetrator was placed on reasonable notice that his behavior was criminal. *Cf. Connally v. General Construction Co.*, 269 U.S. 385, 393, 395, 46 S.Ct. 126, 128, 129, 70 L.Ed. 322 (1926) (A criminal statute must not be so vague that an ordinary person cannot distinguish between criminal and innocent behavior. If "application of the law depends ... upon the probably varying impression of juries as to whether given areas are or are not to be included within" the statute, "[t]he constitutional guaranty of due process cannot be allowed to rest upon a support so equivocal.") In a rape prosecution, proof of the *mens rea* occurs by proving actual or constructive force or proving that the victim made "her lack of consent reasonably manifest." Para. 45c(1)(b).

In the instant case, appellant realized that his acts were criminal, but only as they related to a violation of a lawful general order (fraternization), not rape. Appellant is obviously no saint, and his behavior constituted a gross breach of the standard of conduct expected of a noncommissioned officer. However, a distinction must be made between deplorable conduct based on sexual fraternization and conduct constituting rape. The lead opinion blurs this distinction by holding that appellant's conduct in making unhindered sexual advances towards PVT I leading to sexual intercourse makes him a rapist solely because he was PVT I's supervisor. I cannot join in such a holding. Accordingly, I must dissent.