UNITED STATES, Appellee

v.

Sean P. BRIGHT, Sergeant First Class
U.S. Army, Appellant

No. 07-0269

Crim. App. No. 20020938

United States Court of Appeals for the Armed Forces

Argued April 8, 2008

Decided June 9, 2008

ERDMANN, J., delivered the opinion of the court, in which
EFFRON, C.J., and BAKER, STUCKY, and RYAN, JJ., joined.

Counsel

For Appellant:  Charles W. Gittins, Esq. (argued); Captain Shay
Stanford (on brief); Captain Edward G. Bahdi and Captain Fansu
Ku.

For Appellee:  Captain Teresa T. Phelps (argued); Colonel John
W. Miller II, Major Elizabeth G. Marotta, and Captain W. Todd
Kuchenthal (on brief); Major Tami L. Dillahunt and Captain
Michael Friess.

Amicus Curiae for Appellant:  Charles B. Cromwell (law student)
(argued); Jeffrey T. Renz, Esq. (supervising attorney) (on
brief) -- for the University of Montana School of Law.

Military Judge:  Ronald W. White


**This opinion is subject to revision before final publication.**

United States v. Bright, No. 07-0269/AR

Judge ERDMANN delivered the opinion of the court.

Sergeant First Class Sean P. Bright, a drill sergeant, was convicted of raping a female trainee on three separate occasions.[1] The United States Army Court of Criminal Appeals affirmed his convictions. United States v. Bright, No. ARMY 20020938 (A. Ct. Crim. App. Dec. 19, 2006). We granted review to consider whether the evidence was legally sufficient to support the findings of guilty as to the three rape specifications. 65 M.J. 323 (C.A.A.F. 2007). We hold that the evidence was not legally sufficient to support the rape convictions and reverse the findings as to those specifications.[2]

BACKGROUND

Private W was twenty-three years old when she completed basic training and arrived at Advanced Individual Training (AIT)

---

[1] Bright was also convicted of several other offenses which are not at issue in this appeal, including: two specifications each of forcible sodomy, maltreatment, and violating a lawful regulation by wrongfully having a relationship with a private; one specification each of attempting to violate a lawful general regulation by wrongfully asking a private to have a relationship, adultery, and impeding an investigation. These charges against Bright were based on allegations of improprieties with three different female trainees. Private W, the alleged victim of the rape specifications, was also named in the forcible sodomy specifications, one maltreatment specification, one disobedience specification, and the adultery charge.

[2] Oral argument in this case was heard at the University of Montana School of Law, Missoula, Montana, as part of the court's "Project Outreach." See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

on December 3, 2001.  Bright, Private W's platoon drill sergeant at AIT, made Private W a squad leader.  According to Private W's testimony, on February 1, 2002, Bright called her into his office.  Bright initially engaged her in a verbal exchange typical of the platoon.  He asked questions such as, "'Are you ready for this, private?  Are you ready?'" and "'You ain't ready.  Are you scared?'"  Although Private W did not know what was behind the questions, she responded:  "'Yes, drill sergeant, I'm ready,'" and "'I ain't scared of nothing, drill sergeant.'"  During this exchange, Bright also stated, "'I'm going to get up and you're going to receive.'"  Private W testified that she responded "'Hooah,'" but she did not know what Bright was talking about at the time.

Private W testified that Bright then sent her to wait in the hallway.  Bright left and when he returned he winked at her and called her back into his office.  While she was standing in front of Bright's desk at parade rest, Bright asked Private W if she found him attractive.  Private W initially said, "'I don't know,'" but when Bright pressed the issue, Private W answered affirmatively.  Bright told Private W to go to the female bay and call him on his cell phone.  Bright said that they "were going to meet up at the Comfort Inn."  According to Private W's testimony, she first responded, "'No, it's a bad idea, drill

sergeant.'" Bright persisted, however, and Private W called him.

During the phone call, Bright told Private W to take a cab to the hotel and page him back with the room number. Private W initially "told him no" because she didn't "really want to go meet up with my drill sergeant at a hotel." Private W testified, "[T]here's only one reason you're going to go meet up with somebody at a hotel out of the blue for a couple of hours." On direct examination, Private W indicated that she knew exactly what Bright meant. Private W stated that when she initially refused, Bright told her to meet him "'[o]r else you can stay here this weekend.'"

According to Private W, she was on "Gold Pass" status, which meant that she could freely leave post on the weekends. During the phone call, Bright reminded Private W that he controlled her pass status and asked her if she wanted "to spend eight months at Bravo locked down on Red Pass." When Private W responded that she did not want that, Bright answered, "'Well, then do what I just told you to do,'" and Private W agreed.

Private W testified that she packed a bag, took a cab to the hotel, checked in and paid for the room, and then called Bright with the room number. Private W watched television as she waited for Bright to arrive. When he arrived a few minutes later, Bright gave her money for the room, undressed himself and

told her to take off her clothes. She undressed and they had sexual intercourse. When asked during cross-examination if Bright threatened her, Private W answered, "Not physically, no."

Private W's testimony reveals that she met Bright at various hotels on four more occasions: on or about February 8, February 15, sometime in the middle of March, and on or about April 5, 2002. As to the second encounter on February 8, 2002, Private W testified that "[e]xactly the same thing" happened: she arrived first and checked into the room; when Bright arrived he told her to get undressed; after she undressed they had sex and he left. Private W described the sex on the first and second occasions as "[j]ust normal intercourse." She said she "wasn't really doing anything . . . just laid there . . . and waited." When asked on cross-examination, "You didn't tell him to stop did you?," Private W answered, "No."

Private W's testimony indicates that while she was out with friends, Bright paged her to arrange their third encounter on February 15, 2002. She testified: "[H]e kept paging me and paging me and finally I called him back. And . . . he told me to meet him at the Budget Lodge . . . . So I was like, alright." Bright arrived at the hotel first and was in bed undressed when Private W arrived. Bright told her to take her clothes off. Private W started undressing and Bright helped her finish. In the words of Private W, "then we had sex." Again,

Private W described their encounter as "[j]ust normal intercourse."  She said that it was "[p]retty much the same as usual.  I just kind of laid there and didn't really do much of anything."  When asked on cross-examination, "And [you] just casually kind of had sex and smoked cigarettes, is that right?," Private W answered, "Yes."

The fourth incident involved a mix-up with hotel arrangements.  According to Private W, Bright "showed up eventually" and sent Private W to get beer out of his car.  Private W testified, "I came back in and we just had sex."  On cross-examination, Private W was asked, "so I take it on this one ya'll just had sex, drank beers, smoked cigarettes, is that right?"  Private W answered, "Yes."

With respect to their last encounter on April 5, 2002, Bright paged Private W to arrange their meeting.  When she called him back, he told her to meet him at a specific hotel.  According to Private W's testimony, her response was "okay."  When she arrived at the hotel, Private W called Bright with the room number and ordered a pizza while she was waiting for him to arrive.  Bright told her to call back and order soda.  Private W testified that after the pizza came, "we ate, had sex, and he left."  Private W also testified that "[l]ater on . . . he would tell me he loved me and wanted me to have his baby and stuff

like that."  Her response was:  "I told him it was crazy and no way am I getting pregnant by anybody, let alone him."

Private W's testimony also described an incident of sodomy that she tried to resist.  Private W could not recall exactly when the sodomy occurred, but believed it may have been during their third encounter.  According to Private W, Bright initiated anal sex after intercourse.  Her initial reaction was "'Uh uh.' . . . 'No way.'"  According to Private W's testimony, Bright flipped her body over and she tried to crawl away.  He grabbed her hips and pulled her back towards him.  Private W testified that she said "no" a couple times and tried to move away a couple times and then just waited for it to end.  Private W also testified that Bright told her to perform oral sex on him.  According to Private W, Bright would "push my head in that general direction and I'd just do it."

During her testimony, Private W described how some of their hotel encounters were arranged.  She indicated that sometimes Bright would "make something up to call [her] into his office" and yell at her while gesturing with his hands that she should call him.  He also would page her using a code.  She testified:

> [I]f it was over the weekend or something and I never called him back and he had been paging me then like on Monday or something -- like one time he smoked us.  Right?  He was like, "Private [W], you know you messed up this weekend.  You know what you did wrong," . . . . and we're all down doing pushups.

7

When asked if she had ever seen Bright's "angry side," Private W testified that "he'll like trash things and just start throwing everything around all over the place in his office or something if he's mad. And he just goes off the hook . . . ." Private W made clear in her testimony, however, that he never threw things directly at her. She also testified that "if I hadn't called him in a while when I was supposed to call" he would say to her things like:

> Don't you f[...]ing piss me off because you know I've got control over this company and I can do whatever I want so you better not piss me off and you better do what I tell you to do and when I tell you to do it. I don't give a f[...] about anything else.

Private W emphasized this point later in her testimony, stating that when she didn't return his pages:

> He would yell at me outside and he smoked the platoon or he'd smoke us all or he'd just -- like one time he paged me like a lot and I finally called him back and he told me -- he told me, "Don't piss me off. You don't want to mess with me. I'm the wrong person to be playing around with."

When asked during her testimony if Private W ever thought about running or calling the police while at the hotel room, she answered:

> Not really. For one, there's -- you know, I ain't that big of a person compared to Drill Sergeant Bright, sir, and if I really wanted to run, and he really wanted to stop me, I don't think I'd make it very far. And I never thought about calling the cops really. You know? I didn't think -- they'd be like, "Oh, why are you here with him in the first place anyways?"

8

On cross-examination, Private W was asked about their first encounter on February 1, 2002: "[D]id he or did he not abuse you, cause you any harm, or threaten you at that time?" She answered, "He threatened to take away my pass status and he threatened to keep me on lock down for the entire eight months that I was at Bravo Company." Defense counsel cross-examined her further: "But you never tried to, again, not show up?" Private W answered, "Well, if I just didn't show up, I'd have the consequences to deal with the next week when I saw him again."

On redirect examination, Government counsel specifically asked Private W what those consequences were, and Private W reiterated the concerns she had about her pass status: "He told me he would take away my pass status and that I'd be locked down at Bravo company for the entire time -- for the entire time that I would be there. And I didn't want to do that and that life would be a living hell." Private W never testified that she feared Bright would physically harm her if she did not meet him at the hotels to engage in sexual intercourse.

The Government also presented the testimony of Private M, another squad leader at Bravo Company and a woman with whom Private W had discussed the sexual relationship between herself and Bright. Private M was asked if she had ever seen Bright's "angry side." Private M answered affirmatively and testified

that she felt threatened while he was "chewing [her and Private W] out because of our squads." She stated that Bright said she should be scared of him "'[b]ecause you don't know how mother f[...]in' violent I can get.'" Private M also stated:

> [W]ell, like he would get up into people's faces and tell them to get in the f[...]ing grass -- "Get in the f[...] -- get the hell out of my formation. Get in the f[...]ing grass." And he would like toss stuff all around when he was tearing apart lockers. He would throw people on the grass. He'd -- well, not like throw them, but he would tell them to get in the grass. Get (inaudible) and push. And he would be yelling. He'd like grab their face yelling at them and everything, cussing at 'em.

After the close of the Government's case, the military judge found that the evidence was legally insufficient to support the specification regarding the first allegation of rape on February 1, 2002. The members subsequently found Bright not guilty of raping Private W on February 22, 2002, but guilty of raping Private W on February 8, February 15, and April 5, 2002.[3] Bright was sentenced to reduction to E-1, forfeiture of $550 pay per month for twelve months, confinement for five years, and a dishonorable discharge. The convening authority approved the sentence as adjudged.[4]

---

[3] The members also found Bright guilty of several related offenses. See supra note 1.

[4] As noted, the Army Court of Criminal Appeals summarily affirmed. United States v. Bright, No. ARMY 20020938 (A. Ct. Crim. App. Dec. 19, 2006).

United States v. Bright, No. 07-0269/AR

DISCUSSION

The question before us is whether the evidence is legally sufficient to support the findings of guilty as to the specifications alleging rape on February 8, February 15, and April 5, 2002.  Legal sufficiency is a question of law that this court reviews de novo.  United States v. Tollinchi, 54 M.J. 80, 82 (C.A.A.F. 2000).  The test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, any reasonable factfinder could have found all the essential elements of the offense beyond a reasonable doubt. United States v. Day, 66 M.J. 172, 173 (C.A.A.F. 2008).

Under Article 120(a), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920(a) (2000), "[a]ny person . . . who commits an act of sexual intercourse, by force and without consent, is guilty of rape."  The Manual for Courts-Martial, United States (MCM) identifies the essential elements of rape as follows:  (1) "That the accused committed an act of sexual intercourse;" and (2) "That the act of sexual intercourse was done by force and without consent."  MCM pt. IV, para. 45.b. (2005 ed.).[5]

---

[5] While not applicable to this case, we note that Article 120, UCMJ, has been amended since Bright's court-martial.  See National Defense Authorization Act (NDAA) for Fiscal Year 2006, Pub. L. No 109-163, 119 Stat. 3136, 3257-63 (2006) (to be codified as amended at 10 U.S.C. § 920).  Corresponding provisions in the MCM have also been amended.  See MCM pt. IV, para. 45 (2008 ed.).

11

United States v. Bright, No. 07-0269/AR

     The MCM states further:

> Force and lack of consent are necessary to the offense.  Thus, if the victim consents to the act, it is not rape.  The lack of consent required, however, is more than mere lack of acquiescence.  If a victim in possession of his or her mental faculties fails to make lack of consent reasonably manifest by taking such measures of resistance as are called for by the circumstances, the inference may be drawn that the victim did consent.  Consent, however, may not be inferred if resistance would have been futile, where resistance is overcome by threats of death or great bodily harm, or where the victim is unable to resist because of the lack of mental or physical faculties.  In such a case there is no consent and the force involved in penetration will suffice.  All the surrounding circumstances are to be considered in determining whether a victim gave consent, or whether he or she failed or ceased to resist only because of a reasonable fear of death or grievous bodily harm.

MCM pt. IV, para. 45.c.(1)(b).

     We have recognized that force and lack of consent are separate elements but "there may be circumstances in which the two elements are so closely intertwined that both elements may be proved by the same evidence."  United States v. Simpson, 58 M.J. 368, 377 (C.A.A.F. 2003).  We have also recognized that force can be actual or constructive.  See United States v. Hicks, 24 M.J. 3, 6 (C.M.A. 1987).  In determining whether force and lack of consent occurred, the court-martial must consider the totality of the circumstances presented in the case.  United States v. Cauley, 45 M.J. 353, 356 (C.A.A.F. 1996).

     Bright contends that the rape specifications must be set aside because the Government failed to establish that sexual

12

intercourse occurred without Private W's consent; or if the intercourse did occur without consent, the Government failed to establish that Bright would reasonably have been aware of Private W's non-consent due to her conduct.  Bright also argues that the evidence was legally insufficient to establish constructive force because there was no nexus in time, place or circumstances between Bright's on-duty tirades and the off-post intercourse.

The Government responds that Private W had a reasonable belief that resistance would be futile based upon Bright's repeated threats, intimidation, and abuse of his authority and position as Private W's drill sergeant.  Consequently, the Government contends, consent may not be inferred and constructive force has been established.

We turn first to the issue of consent and consider whether Private W made her lack of consent "reasonably manifest by taking such measures of resistance as called for by the circumstances."  MCM pt. IV, para. 45.c.(1)(b).  Proof that Private W physically resisted Bright is not needed to support a finding of lack of consent.  Cauley, 45 M.J. at 356 (citing United States v. Webster, 40 M.J. 384, 386 (C.M.A. 1994)).  "A lack of consent can be manifested by the victim in a number of ways other than physical resistance."  Id.  In Webster for example, we concluded that the victim's repeated verbal

rejections were enough to establish that the members could reasonably have found or inferred beyond a reasonable doubt the element of lack of consent.  40 M.J. at 387.

In this case, however, the record is devoid of any evidence showing that Private W manifested a lack of consent or took any measures to resist sexual intercourse with Bright on February 8, February 15, and April 5, 2002.  Private W's testimony establishes that on each occasion, she made arrangements by phone with Bright to meet at a hotel, fully cognizant that once at the hotel, the two would engage in sexual intercourse.  Then, unaccompanied by Bright, Private W made her own way to the designated hotel.

In two of these three incidents, Private W reached the hotel before Bright and waited for him to arrive.  Excluding the incident of sodomy which is not at issue in this appeal, Private W's descriptions of their sexual encounters do not include any indication that Private W verbally or physically resisted sexual intercourse either at the time the arrangements were made to meet for sex or once the two were together at the hotel.

On the contrary, Private W's testimony reveals that during the phone calls preceding the hotel meetings on February 15, and April 5, 2002, she affirmatively voiced her agreement to meet Bright at the hotels, and there is no question that she knew they would engage in sexual intercourse at the hotels.  In

14

addition, when trial counsel asked her about having sex with Bright on February 8, 2002, Private W testified expressly that she did not tell Bright to stop.

This conduct contrasts markedly with her response to Bright on the one occasion when he initiated anal sodomy after intercourse. According to Private W's testimony, at that time she repeatedly told Bright "no" and tried to crawl away to avoid his advances. While Private W's conduct with respect to the sodomy incident clearly supports a finding that lack of consent was reasonably manifest as to that act, Private W's accounts of what she called "[j]ust normal intercourse" lack any similar manifestations of lack of consent. We conclude that her testimony with respect to the acts of "normal intercourse" fails to provide a basis from which lack of consent can reasonably be inferred.

Our conclusion that Private W did not make her lack of consent reasonably manifest does not end our inquiry into consent. As stated in the MCM, "[c]onsent, however, may not be inferred if resistance would have been futile, where resistance is overcome by threats of death or great bodily harm, or where the victim is unable to resist because of the lack of mental or physical faculties." MCM pt. IV, para. 45.c.(1)(b). As this case does not involve questions regarding the lack of mental or physical faculties, we next consider whether "resistance would

15

have been futile, where resistance is overcome by threats of death or great bodily harm." Id.

In support of its argument that resistance would have been futile, the Government points to Private W's testimony that before she entered the Army, she was told that she would be raped by a drill sergeant and there was nothing she could do about it. The Government also points to Private W's testimony that she did not think about running or calling the police when she was with Bright at the hotels because "I ain't that big of a person compared to Drill Sergeant Bright" and "if I really wanted to run, and he really wanted to stop me, I don't think I'd make it very far." In addition the Government relies on the testimony of another squad leader, Private M, who testified that in the presence of Private W, Bright talked about his capacity for violence. Finally, the Government points to the sodomy incident, where Private W verbally indicated non-consent and tried to crawl away, but Bright pulled her back and subjected her to an act of sodomy despite Private W's resistance.

In resolving questions of legal sufficiency, this court is "'bound to draw every reasonable inference from the evidence of record in favor of the prosecution.'" United States v. Rogers, 54 M.J. 244, 246 (C.A.A.F. 2000) (quoting United States v. Blocker, 32 M.J. 281, 284 (C.M.A. 1991)). When considered under this standard, Private W's testimony about the incident of

forcible sodomy and her testimony regarding Bright's ability to catch her if she ran from the hotel arguably provides some support for a finding that, <u>once Private W was physically present in the hotel with Bright</u>, resistance to sex may have been futile.

However, the members are bound to consider the totality of the circumstances presented by each case. <u>Cauley</u>, 45 M.J. at 356. On the facts of this case, when addressing whether the futility of resisting sexual intercourse with Bright establishes lack of consent, the Government cannot overcome the fact that Private W was physically separated from Bright at the time she agreed to meet him for sex on February 8, February 15, and April 5, 2002. After affirmatively indicating on the phone that she was willing to meet him at the hotel, Private W made her own way to the hotel unaccompanied by Bright who arrived at the hotel on each occasion separately. There is no evidence to support the inference that avoiding the hotel room would have been a futile act of resistance.

In fact, Private W never testified that it would have been futile to resist the encounters altogether. Rather, she testified that if she did not meet him at the hotels as requested, there would be consequences. In particular, she indicated that on one occasion where she did ignore his pages, Bright "smoked the platoon." That is, after she resisted his

17

advances, he subjected the platoon to rigorous physical training in the form of push-ups as a consequence for Private W's decision not to return his pages. She also testified that he threatened to revoke her Gold Pass status, which would require her to remain on base.

The facts preceding each of the sexual encounters in this case differ significantly from those of United States v. Clark, 35 M.J. 432, 435 (C.M.A. 1992), and Simpson, 58 M.J. at 377, upon which the Government relies. In Clark, the evidence supported findings that the appellant confined the victim in an isolated area in a small shed with brick walls and a metal door and that he positioned himself between the door and the victim. 35 M.J. at 433-35. In Simpson, the evidence supported findings that the appellant refused to accept verbal and physical indications that his victims were not willing participants and that he used his authority over the victims to issue orders that placed them in the isolated locations where the charged rapes occurred. 58 M.J. at 377. In this case, the sexual encounters took place in hotel rooms to which Private W traveled unaccompanied by Bright after agreeing to meet him for sex.

We next consider whether the record could support a finding that resistance was overcome by threats of death or grievous bodily injury. We conclude that the record could not support such a finding. There is no evidence that the extra physical

training endured by the platoon, while no doubt grueling, created a risk of death or grievous bodily injury. Nor could a reasonable factfinder infer that the heated statements Bright made in formation or in his office when he addressed Private M's and Private W's performance as squad leaders conveyed threats of death or grievous bodily harm if Private W resisted his sexual advances.

Indeed, Private W never testified that Bright threatened her with death or grievous bodily harm. Rather, when given an opportunity to explain the threats at issue, Bright was explicit that: "He threatened to take away my pass status and he threatened to keep me on lock down for the entire eight months that I was at Bravo Company." She subsequently reiterated this concern: "[H]e told me he would take away my pass status and that I'd be locked down at Bravo company for the entire time -- for the entire time that I would be there. And I didn't want to do that and that life would be a living hell."

We do not question that Bright's conduct -- an egregious abuse of his position for which he was charged and convicted of maltreatment -- was criminal. However, we cannot conclude that a reasonable factfinder could find that the particular circumstances involved in this case show that "resistance [was] overcome by threats of death or great bodily harm" necessary to sustain a conviction for rape. MCM pt. IV, para. 45.c.(1)(b).

19

For all the reasons stated above, we hold that a reasonable factfinder could not find that the evidence establishes lack of consent beyond a reasonable doubt.  Accordingly, we hold that the evidence is not legally sufficient to support the three rape specifications.  Because our legal conclusions regarding the element of lack of consent resolves the question of legal sufficiency, we do not consider the matter of constructive force.

### DECISION

As the evidence in this case is legally insufficient to support convictions for rape on February 8, 2002, February 15, 2002, and April 5, 2002, the findings of guilty as to Charge I, Specifications 2, 3, and 5 are set aside.  The remaining findings are affirmed.  The record of trial is returned to the Judge Advocate General of the Army for remand to the United States Army Court of Criminal Appeals.  The lower court may reassess the sentence or order a rehearing on sentence, as appropriate.