# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40479**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jonathan L. BRIERLY**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 25 November 2024

————————————

*Military Judge*: Pilar G. Wennrich.

*Sentence*: Sentence adjudged on 17 January 2023 by GCM convened at Scott Air Force Base, Illinois. Sentence entered by military judge on 22 February 2023: Dishonorable discharge, confinement for 15 months, and reduction to E-1.

*For Appellant*: Major Matthew L. Blyth, USAF; Major Megan R. Crouch, USAF.

*For Appellee*: Colonel Zachary T. Eytalis, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, MASON, and KEARLEY, *Appellate Military Judges*.

Judge KEARLEY delivered the opinion of the court, in which Senior Judge RICHARDSON and Judge MASON joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

KEARLEY, Judge:

A military judge sitting as a general court-martial convicted Appellant, contrary to his pleas, of two specifications of abusive sexual contact and two specifications of sexual assault, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920,[1] and one specification of assault consummated by a battery, in violation of Article 128, UCMJ, 10 U.S.C. § 928, all committed against LB. The military judge sentenced Appellant to a dishonorable discharge, 15 months' confinement, and reduction to the grade of E-1.[2] The convening authority took no action on the findings or sentence.

Appellant raises two issues on appeal, which we reworded here: (1) whether Appellant's convictions are legally and factually sufficient and (2) whether the record of trial is substantially complete.

On 20 September 2024, we issued an unpublished opinion wherein we found no error that materially prejudiced Appellant's substantial rights, and we affirmed the findings and sentence. On 13 November 2024, we granted Appellant's motion for reconsideration concerning the standards of review we applied in our analysis of issue (2) and vacated our original opinion in this case. After reconsideration, we again find that no error materially prejudiced Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND[3]

Appellant and LB worked together as members of the Kentucky Air National Guard. Both were assigned to the engine shop within the maintenance squadron. In September 2019, Appellant, LB, and other personnel went to Germany for a temporary duty assignment (TDY). The first night they arrived in Germany, Appellant, LB, and about eight others went out to dinner at a local restaurant. Appellant and others drank alcohol at dinner; however, LB did not drink because she was the designated driver for the group.

After dinner, Appellant, LB, and others from the group returned to their hotel. Appellant and the others continued drinking on a patio outside. While LB stayed on the patio and socialized, she did not drink any alcohol the entire evening. At approximately midnight, Appellant, LB, and a few others decided

---

[1] Unless otherwise noted, all references to the UCMJ and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] For sentencing, the military judge merged Specifications 1 and 2 of Charge I (abusive sexual contact) and merged Specifications 3 and 4 of Charge I (sexual assault).

[3] The following background is drawn primarily from LB's trial testimony, supplemented by other evidence from the record of trial.

to go to their rooms because they had to work the next day. Appellant's and LB's rooms were across the hall from each other. Believing Appellant was intoxicated, LB went into Appellant's room with Appellant "to make sure he was okay, by making sure he had water and checking to make sure he had a trashcan nearby."

At the time, LB was 20 years old and saw Appellant as a brother figure. She considered most of her male colleagues from her Air National Guard unit to be like big brothers and they treated her like a little sister.[4] Appellant was 33 years old and married. During trial, LB described her relationship with Appellant as platonic where neither had expressed any physical or romantic feelings towards one another. Overall, LB considered Appellant a "good guy." She trusted Appellant because their military community was very "close-knit," so much so that being in each other's hotel rooms while traveling was not considered a big deal. LB explained, "[T]hey're my brothers, I wouldn't have thought anything of it."

Once in his hotel room, Appellant laid down on the bed, rolled his face into the pillow, and asked LB to turn on the TV. Appellant asked LB to fix the TV several times because LB could not get it to work. LB offered to pull up a movie on her phone. She sat at the foot of the bed, found a show, and held her phone so both of them could watch it. Appellant patted the bed for her to lie next to him. LB, still holding the phone, laid down on the bed next to Appellant and continued to watch the show with him. After about 10 to 15 minutes, Appellant appeared tired, and LB decided to leave and return to her room. Before she left, LB made sure there was a trash can and a glass of water next to Appellant's bed. She turned off the lights and went to her room across the hall. Once in her room, she sent Appellant a text message that read, "I'm going to be up for a bit, so if you need anything let me know. Don't throw up in your bed, and drink water."

Shortly after returning to her room, LB heard a crying sound, so she opened her door to get a better sense of what was happening. A few seconds later, Appellant opened his door, saw LB standing in her doorway across the hall, and told LB, "[T]his place is creeping me out." LB said it was creeping her out too, at which point Appellant asked her if she wanted to come into his room to

---

[4] LB described how people in her shop treated her like a little sister, including standing up for her when someone said anything disrespectful or inappropriate. She also described a general atmosphere of a tightknit and caring community where "nobody walks back to their room alone. Nobody goes and hangs out with anybody else alone. If we go out together, we come back together."

play games. LB agreed, thinking they would either continue watching the show or play cards.[5]

Once in Appellant's room, Appellant motioned for LB to sit down next to him on the foot of the bed, facing out towards the window. Appellant asked LB what her biggest fear was and she told him it was looking out at windows when it is dark outside. They made other small talk and Appellant laid back down on the bed. LB contemplated leaving because she thought Appellant was not feeling well. However, Appellant patted the bed for LB to lie down next to him. She laid down again and asked him if he wanted to watch the show some more. Appellant did not respond, but after a while they continued to make small talk. At some point during this conversation, Appellant grabbed LB's hand and placed it on his pants over his groin; LB could feel Appellant's penis through his clothing.

LB pulled her hand away and told Appellant, "[T]hat's not okay." Appellant responded, "I don't know what you mean." Based on Appellant's response, LB thought maybe she misunderstood Appellant or that Appellant did not realize he had put her hand over his genitals, and decided not to pursue the issue. However, Appellant again placed her hand on his groin area, and again she could feel his penis through his clothing. At this point, LB told Appellant she needed to leave. Appellant asked her not to go, and as LB sat up to leave, Appellant got on top of her, began kissing her neck, and attempted to kiss her on the mouth. LB pulled away and told Appellant "no" multiple times. She kept her mouth closed as he tried to kiss her on the lips.

LB testified that after Appellant tried to kiss her on her lips, he pulled her shirt and bra up and started kissing her nipples, using both his tongue and mouth. She described feeling "frozen and trapped," and recalled telling Appellant to stop and reminding him he was married. She tried to "beg him, [telling] him this isn't what he wants to do." She told him this "multiple times . . . [and] very loudly."[6] Appellant then pulled her pants off, removed his shorts, grabbed her by the back of her neck, and pulled her upwards to sit up. He then put his penis in her mouth. LB described how he pushed her head, forcing his penis in her mouth repeatedly. Then he laid her down and penetrated her vaginally with his penis and continued thrusting his penis inside her vagina for a couple minutes. LB explained that she was crying and telling him "no" and "stop." Then, he grabbed her by the back of the neck and pulled her forward again. He put his penis in her mouth again and ejaculated in her mouth. After he was

---

[5] LB described that on TDYs it was common for people to bring cards or games to play with others because it can be "kind of boring" if you are in a hotel room.

[6] During trial, LB clarified she was speaking as loudly as she was speaking in the courtroom.

done, Appellant then laid on top of LB for some time. Once he moved off her and laid back down on the bed, LB ran to the bathroom and spat out his ejaculate in the sink. She returned to the room, quickly put her pants on, and confronted Appellant, telling him that she asked him to stop—that she begged him to stop. Appellant replied, "I don't understand." At some point, while still in the room, LB said, "[Y]ou have a f[**]king wife, I feel disgusting." LB said she wanted to leave, but Appellant stood between her and the door. He asked her not to leave and told her he did not understand what just happened. LB asked Appellant several times why he did not stop. At trial, LB said each time she asked him, "he continued talking about how he didn't understand."

Feeling like she could not leave the room, LB tried to hide herself in the corner of the bed that bordered the corner of the wall. She placed herself in the fetal position and started crying. LB again told Appellant that she asked him to stop and begged him to stop. She asked Appellant, "[W]hy didn't you stop." Appellant said, "I don't understand. We f[**]ked up." LB said, "I didn't do anything. I asked you to stop."

Eventually, LB left Appellant's room and went to her room. LB did not know what to do and was trying to process what happened. She grabbed her cigarettes and went downstairs to the patio. There, she encountered two noncommissioned officers (NCOs) from another unit, Technical Sergeant (TSgt) WL and TSgt JD. They asked her why she was crying and she told them she just broke up with her girlfriend, because she didn't want them to know the real reason she was upset. LB explained she "was afraid to tell anybody" because she "was afraid to trust anybody."

TSgt WL and TSgt JD tried to joke with LB and make her smile. Shortly after LB's arrival, Appellant joined the group on the patio and started joking around with the NCOs. One of the NCOs offered LB his coat and Appellant took the coat acting "the jokester," and ended up putting both NCOs' jackets on. At trial, Master Sergeant (MSgt) WL testified that Appellant seemed like he was still drunk and also appeared "zoned out" at times.[7] MSgt JD testified that "[he] could tell that [Appellant] already [had] a few beers and he was a little [ ]belligerent." After chatting for a while, the NCOs decided to get more beer from a local gas station. LB offered to go with them because she did not think it was a good idea for them to go by themselves as they "were drunk and it was a far walk to the gas station."

LB went back into the hotel to get her jacket and wallet. Appellant followed her. On the way back to their rooms, Appellant told LB, "[W]e f[**]ked up," and

---

[7] By the time of their testimony, both TSgt WL and TSgt JD had promoted to the next rank, master sergeant.

asked her not to tell anyone. While talking to her, he grabbed her hand as if to shake it, and held it until she promised she would not tell anyone. After LB promised not to tell, Appellant told her he was going to bed and returned to his room.

LB returned to the patio and found that the NCOs had already left, so she headed back up to her room. She wanted to take a shower but wondered what she was supposed to do or what she needed to do. She took off her clothing and placed it in a drawer in her hotel room. She called her mother, crying, and said she "just wanted him to stop." She tried to "tell her . . . the best [she could] without . . . telling her too much."

LB's mother told LB that she needed to get help and asked her to tell someone who is with them in Germany. LB explained that everyone in Germany was still asleep. After speaking with her mother, LB called Senior Master Sergeant JW, her superintendent and direct supervisor, who was still in Kentucky. At trial, JW[8] testified that LB sounded "shaky, very fast talking, [and] her thoughts were scattered a bit." He described her demeanor on the telephone as shaken, upset, disoriented, and audibly crying. JW assumed something "very severe" had occurred and he told her the difference between restricted and unrestricted reporting. He asked LB if she was alright and advised her that if she needed to be with someone to be safer, she should reach out to one of the Airmen on the trip with her.

The following morning, LB decided to stay in her room. Late in the afternoon, she joined a group to get food after making sure Appellant was not with them. While at the restaurant, LB "couldn't even eat." Upon returning to the hotel, she tried to socialize with the NCOs from her unit. LB eventually told them she needed to go to the hospital and confided it was for "a rape kit." LB went to the hospital for the rest of the evening and underwent a three-hour sexual assault forensic examination (SAFE). The examiner collected evidence that was sent to a lab. Appellant's DNA was included as contributor to the DNA profile developed from external genital swabs taken from LB as part of the SAFE.

The day after her exam, LB met with agents from the Air Force Office of Special Investigations (AFOSI) and reported the assault. Early in the interview, LB chose not to name the person who assaulted her. However, eventually she told the AFOSI agents it was Appellant. LB agreed on cross-examination that when the agents asked her why she did not tell anyone who did this to her, she said, "I don't believe in someone getting hated on, especially if they are not guilty." LB testified that she did not remember making that statement,

---

[8] By the time of trial, SMSgt JW had retired.

but if she did, it was "just in respect to, we're in a tightknit group, so I wouldn't ever expected that to come from anybody from our group." LB further explained that she did not intend to express through this statement that Appellant was not guilty of the offenses she described to AFOSI.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of his convictions, arguing: (1) LB was not a credible witness, and consented to the sexual acts; or (2) Appellant had a reasonable mistake of fact as to consent. After carefully considering the entire record, we find that Appellant's convictions are legally and factually sufficient.

#### 1. Additional Background

LB testified that during the assault she did not yell because she was afraid of how Appellant would react or if he would become angry. LB explained that while growing up she had an abusive father, and if she did not listen to him there would be "consequences." LB described feeling "stuck" during the assault and claimed she did not know how to make Appellant stop. She felt like Appellant was "not hearing her" because she kept saying "no" but Appellant would not stop. LB expressed she was upset with herself because she did not fight or hit Appellant—all the things that her mother had taught her to do.

At trial, two witnesses described LB and Appellant's interactions at the dinner the evening of the assault. One described LB being flirtatious with Appellant, but the other did not witness any flirtation between them.

#### 2. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). In resolving questions of legal sufficiency, we are "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Bright*, 66 M.J. 359, 365 (C.A.A.F. 2008) (citation

omitted). The evidence supporting a conviction can be direct or circumstantial. *See United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021) (citing Rule for Courts-Martial (R.C.M.) 918(c)) (additional citation omitted). "[A] rational fact-finder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that Appellant committed the offense charged. *Id.* at 369 (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). The "standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

To convict Appellant of the first specification of abusive sexual contact, the Government was required to prove beyond a reasonable doubt all elements as charged: (1) Appellant caused LB to touch his penis with her hand, (2) with the intent to gratify his sexual desire, and (3) without her consent. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(4)(d).

To convict Appellant of the second specification of abusive sexual contact, the Government was required to prove beyond a reasonable doubt all elements as charged: (1) Appellant touched the breasts of LB with his mouth, (2) with the intent to gratify his sexual desire, and (3) without her consent. *See MCM*, pt. IV, ¶ 60.b.(4)(d).

To convict Appellant of the first specification of sexual assault, the Government was required to prove the following elements beyond a reasonable doubt: (1) Appellant committed a sexual act upon LB by penetrating her vulva with his penis, and (2) Appellant did so without LB's consent. *MCM*, pt. IV, ¶ 60.b.(2)(d).

To convict Appellant of the second specification of sexual assault, the Government was required to prove the following elements beyond a reasonable doubt: (1) Appellant committed a sexual act upon LB by penetrating her mouth with his penis, and (2) Appellant did so without LB's consent. *MCM*, pt. IV, ¶ 60.b.(2)(d).

To convict Appellant of assault consummated by a battery, the Government was required to prove the following elements beyond a reasonable doubt: (1) Appellant did bodily harm to LB by kissing LB on the neck with his lips,[9] (2) that bodily harm was done unlawfully, and (3) that the bodily harm was done with force or violence. *MCM*, pt. IV, ¶ 77.b.(2). Bodily harm is done unlawfully when "no legally cognizable reason existed that would excuse or justify the contact." *United States v. Bonner*, 70 M.J. 1, 3 (C.A.A.F. 2011); *see also United States v. Johnson*, 54 M.J. 67, 69 (C.A.A.F. 2000) (recognizing that legal excuses or justifications, such as consent, can result in a lawful touching).

"The term 'consent' means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance does not constitute consent." Article 120(g)(7)(A), UCMJ, 10 U.S.C. § 920(g)(7)(A). "All the surrounding circumstances are to be considered in determining whether a person gave consent." Article 120(g)(7)(C), UCMJ, 10 U.S.C. § 920(g)(7)(C).

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." R.C.M. 916(j)(1). "If the mistake goes to an element requiring general intent, it 'must have existed in the mind of the accused and must have been reasonable under all the circumstances.'" *Rodela*, 82 M.J. at 526 (quoting R.C.M. 916(j)(1)). An honest and reasonable mistake that the victim consented to the charged sexual act is an affirmative defense to sexual assault. *United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019). "If a mistake is honest yet 'patently unreasonable,' the defense is unavailable to an appellant." *Rodela*, 82 M.J. at 526 (quoting *United States v. Davis*, 76 M.J. 224, 230 (C.A.A.F. 2017)). The mistake "must be reasonable under all the circumstances as assessed by an ordinary, prudent, sober adult." *United States v. Moore*, No. ACM S32477, 2018 CCA LEXIS 560, at *12 (A.F. Ct. Crim. App. 11 Dec. 2018) (unpub. op.) (citation omitted). "Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist." *Id.* (citing R.C.M. 916(b)(1)) (additional citation omitted). "Just as a victim's 'lack of verbal or physical resistance does not constitute consent,' *MCM*, pt. IV, ¶ 60.a.(g)(7)(A), a victim's lack of verbal or physical resistance, without more, is not some evidence of a reasonable belief that consent has been obtained (or given)." *Id.* at 529; *see also McDonald*, 78 M.J. at 377 (explaining that "[t]he

---

[9] The specification alleged that Appellant unlawfully kissed KB's neck with his tongue. The military judge found Appellant guilty of this specification by excepting the word "tongue" and substituting the word "lips." Appellant was found not guilty of the excepted word (tongue) and guilty of the substituted word (lips).

burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent").

### 3. Analysis

Appellant asserts the conviction is legally and factually insufficient because the

> evidence adduced at trial demonstrates LB was not a credible witness, such that any rational trier of fact could not have found the essential elements of the alleged crimes beyond a reasonable doubt . . . [b]ut even if this [c]ourt believes LB's story of events could be true, any rational trier of fact would have found [Appellant] had a reasonable mistake of fact as to consent.

Having considered Appellant's arguments and having reviewed the record, we find the evidence presented sufficiently supports the findings of guilty.

#### a. Legal Sufficiency

Appellant does not deny the acts occurred, and there is DNA evidence to support that Appellant had sexual relations with LB. Therefore, we first consider Appellant's argument that his conviction is legally insufficient because he had an honest and reasonable mistake of fact that LB consented to sexual activity. Appellant claims he had a reasonable mistake of fact because LB was flirting with him at dinner that night; LB went to Appellant's hotel room twice around midnight and willingly laid down in bed next to Appellant; LB stayed in Appellant's room when he tried to engage in sexual activity with her; and Appellant communicated a subjective mistake of fact as to consent, when he said, "[W]e f[**]ked up," demonstrating he believed they were two consenting individuals.

While Appellant provided some evidence that he may have had an honest mistake of fact as to consent, a review of the evidence presented in this case convinces us that assuming Appellant did have an honest mistake of fact as to consent, such a belief would have been unreasonable under the circumstances. LB rebuffed Appellant twice when he placed her hand on his penis over his shorts during his first attempt to initiate sexual contact. The first time Appellant placed her hand on his penis, LB told him that it was "not okay." Appellant acted like he did not understand, causing her to think he did not realize where he put her hand. When he placed her hand on his penis a second time, LB said "no" and that she had to leave. Given LB's response to Appellant's first attempt to get LB to touch his penis, any mistake of fact as to consent after this point would have been unreasonable.

Additionally, we see no intervening event which would have made a reasonable person think LB changed her mind after her initial refusal. She did

nothing verbally or physically to indicate she wanted to have sex with Appellant. On the contrary, she said she needed to leave, repeatedly told Appellant "no," and brought up his wife in an effort to reason with him. We are firmly convinced that any mistake of fact was unreasonable.

Additionally, given the context of the evening, other facts Appellant relies on to show a reasonable mistake of fact are not persuasive. For example, while lying in bed, LB and Appellant talked about their "deepest fears," which is not a discussion with sexual or flirtatious connotations, especially after they both acknowledged they were "creeped out" by the sound of crying in the hallway. Furthermore, being in the room, alone, together is not by itself indicative of sexual interest, as Appellant implies. LB had already spent time in Appellant's room that evening without Appellant making any sexual advances towards her and had no reason to expect he would make sexual advances upon her return. Finally, LB and Appellant had a platonic relationship and their organizational culture was one of tightknit camaraderie where it was not unusual to visit other members of the unit in their hotel rooms while on TDY.

Appellant points to their interactions at dinner and inside his hotel room to argue that his mistake of fact as to consent was reasonable. However, even if we are to presume that LB had romantic feelings for Appellant, no event during the course of the evening suggests that LB expressed sexual interest in him. The lack of any such event, combined with LB's verbal refusal to engage in sexual acts with Appellant, makes any mistake of fact on the part of Appellant patently unreasonable.

We pause here to note an appellant's intoxication is not relevant to the reasonableness prong of this defense, as the reasonableness of any mistake is from the perspective of a sober person. *See Moore*, unpub. op. at *12. An ordinary, sober adult would not climb on top of a co-worker and begin kissing her as she was trying to leave, especially after he was verbally rebuked twice for placing her hand on his penis.

Regarding Appellant's other arguments for why LB is not credible, Appellant repeats many of the same arguments he made before the factfinder. We presume the military judge considered these arguments by trial defense counsel, encouraging her to view the testimony and other evidence through their lens. After viewing the evidence in light most favorable to the Prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

In sum, a rational finder of fact could have found the Government proved each element of the offenses, and disproved the defense of mistake of fact as to consent, beyond a reasonable doubt. Therefore, Appellant's convictions are legally sufficient.

### b. Factual Sufficiency

Appellant argues his conviction was factually insufficient and claims that LB is not credible for several reasons. After reviewing the entire record, we find the evidence factually sufficient to sustain Appellant's conviction. We address several of Appellant's arguments below.

### i) Motive to fabricate – cognitive dissonance

Appellant asserts that "LB had a motive to fabricate the events that occurred in [Appellant's] hotel room and her willingness to be an active participant in them" because "she was likely experiencing cognitive dissonance as a result of her consensual sexual behavior with a married man from her unit." This theory was fully developed at trial by trial defense counsel through the use of expert testimony by a licensed clinical and forensic psychologist, and presented to the factfinder. We presume the factfinder found this theory unpersuasive, as do we.

LB's actions directly after the incident strongly support Appellant's conviction on all specifications. Shortly after the assault, LB called her mother and her supervisor. She preserved her clothes, did not take a shower, went to the hospital for a sexual assault exam, and spoke to AFOSI the following day. She reported the sexual assault almost immediately after it happened, while walking the delicate line between getting help and preserving her ability to decide whether she wanted to disclose the name of the person who assaulted her. LB's actions within 48 hours of the incident lend credibility to her version of events and detract from the Defense's cognitive dissonance theory.

### ii) Credibility

In addition to the cognitive dissonance theory, Appellant would have us find that LB was not a credible witness because: (1) her version of events at trial was different than what she reported shortly after the assault; (2) she had additional motives to fabricate;[10] (3) her story of events is physically implausible; and (4) she had a reputation for being attention-seeking, exaggerating, and stretching the truth.

We will briefly address the first credibility claim. Approximately three years had passed between LB's interview with AFOSI and the trial. Appellant points out a series of inconsistencies between LB's testimony at trial and her statement to AFOSI. While LB's testimony at trial differed in some aspects

---

[10] Appellant's additional arguments for a motive to fabricate include: to preserve her relationship with her ex-girlfriend, to satisfy her mother who told her she needs to tell someone, and to protect her reputation.

from her initial statements to AFOSI, the inconsistencies are minor.[11] It is reasonable that LB's ability to recall specific details may have changed over the three years between her report to AFOSI and the trial. We have weighed the evidence in the record and determined that the discrepancies in LB's testimony, including lapses in memory or recall, were not persuasive in casting doubt on LB's credibility. Additionally, LB's testimony was consistent in terms of the facts that supported each element of the offenses and her repeated protests. Moreover, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

## B. Contents of Record

Appellant asserts he is entitled to sentence relief because his "record of trial is substantially incomplete" as it is missing a complete copy of Preliminary Hearing Officer (PHO) Exhibit 7—the audio recording of the open and closed sessions of the Article 32, UCMJ, 10 U.S.C. § 832, hearing. The Government argues the omission of the portions of the preliminary hearing recording was not a substantial omission to the record of trial and does not raise a presumption of prejudice. We do not find the lack of audio recording for a portion of the preliminary hearing to be a substantial omission.

### 1. Additional Background

On 12 May 2022, Appellant and trial counsel participated in a preliminary hearing conducted pursuant to Article 32, UCMJ. The hearing was recorded by trial counsel using a handheld recording device. Trial counsel learned at the conclusion of the hearing that the batteries in the recording device had stopped working near the end of the hearing, leaving the closing arguments by counsel unrecorded. In total, 22 minutes of the preliminary hearing were successfully recorded.

No witnesses testified during the hearing. The PHO recommended that all charges and specifications be withdrawn and dismissed. Trial defense counsel did not object based on the incomplete recording during or after the preliminary hearing or at trial.

---

[11] Inconsistencies Appellant pointed out included, but are not limited to: whether Appellant placed his penis in LB's mouth both before and after vaginal penetration or only before; whether she was crying on the bed or merely "zoned out;" whether lights were on or off during different portions of the evening; whether the door to the bathroom was closed or partially closed; whether a promise not to tell was proceeded by a "handshake" or a "grab;" or whether she laid back down on one side of the bed or the other.

The PHO considered the following exhibits and both trial counsel and trial defense counsel had access to them: charge sheet, AFOSI report of investigation, AFOSI interview of LB, time hacks of the interview, PHO scheduling memo, and audio recording of the preliminary hearing.

### 2. Law

A "complete record of proceedings and testimony" must be prepared when the sentence at a court-martial includes a punitive discharge. Article 54(c)(2), UCMJ, 10 U.S.C. § 854(c)(2); R.C.M. 1114(a)(1). The President prescribed the other contents of the record of trial in R.C.M. 1112(b). *See* Article 54(c)(1), UCMJ, 10 U.S.C. § 854(c)(1). The President also prescribed items to be attached to the record of trial for appellate review, which include, *inter alia*, the "preliminary hearing report under Article 32, [UCMJ,] if any." R.C.M. 1112(f)(1)(A).

Whether a record of trial is complete is a question of law we review de novo. *United States v. Davenport*, 73 M.J. 373, 376 (C.A.A.F. 2014) (citation omitted). "A substantial omission renders a record of trial incomplete and raises a presumption of prejudice that the Government must rebut." *United States v. Miller*, 82 M.J. 204, 207 (C.A.A.F. 2022) (alteration omitted) (quoting *United States v. Henry*, 53 M.J. 108, 111 (C.A.A.F. 2000)). However, "[i]nsubstantial omissions from a record of trial do not raise a presumption of prejudice or affect that record's characterization as a complete one." *Henry*, 53 M.J. at 111. We approach the question of what constitutes a substantial omission on a case-by-case basis. *United States v. Abrams*, 50 M.J. 361, 363 (C.A.A.F. 1999) (citation omitted). When assessing whether a record is complete, "the threshold question is whether the omitted material was 'substantial,' either qualitatively or quantitatively." *Davenport*, 73 M.J. at 377 (internal quotation marks omitted) (quoting *United States v. Lashley*, 14 M.J. 7, 9 (C.M.A. 1982)) (additional citation omitted).

Article 32(e), UCMJ, requires the preliminary hearing be recorded by a suitable recording device. 10 U.S.C. § 832(e).

R.C.M. 405(j)(5) requires the Government to ensure the preliminary hearing is recorded and R.C.M. 405(l)(2)(B) requires this recording be included as part of the preliminary hearing report. An appellant who fails to object to defects in the preliminary hearing report before entering pleas forfeits such objection "absent an affirmative waiver." R.C.M. 905(b)(1), (e)(1). "Forfeiture is the passive abandonment of a right by neglecting to preserve an objection" and results in a plain error analysis. *United States v. Davis*, 76 M.J. 224, 227 n.1 (C.A.A.F. 2017) (first citing *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009); then citing *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009)). "Under a plain error analysis, an appellant has the burden of demonstrating

that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the appellant." *Id.* at 230 (citation omitted). An appellant must prevail on all three prongs to merit relief.

### 3. Analysis

We begin by noting that Appellant failed to raise an objection to the PHO report when it was issued or with the military judge before Appellant entered pleas. Since Appellant did not raise his objection to the preliminary hearing report before the trial, it has resulted in forfeiture of the objection. *See* R.C.M. 905 (e)(1). As such, we review for plain error.

As the batteries were not sufficient to record the entire hearing, the recording device was arguably unsuitable. We find there was error because a preliminary hearing should have been recorded with a suitable recording device. Article 32(e), UCMJ. However, Appellant has failed to demonstrate any resulting prejudice from the omission of the recording. We find no prejudicial error.

We further note the "missing" audio was never recorded, so this is not an issue where the audio was lost after the fact. Thus, we next consider whether incomplete audio recording of a preliminary hearing with no witness testimony is a substantial omission that renders the record incomplete, an issue we review de novo.

Appellant claims the incomplete audio recording is a substantial omission because there is no way to determine what was said during the hearing or what arguments were made regarding M.R.E. 412 evidence that was ultimately not considered by the PHO. Appellant claims "since the missing audio recording has been lost and cannot be produced by the legal office, a rebuttable presumption of prejudice is raised."

While the recording failed to capture arguments made by counsel at the preliminary hearing, it did not fail to capture evidence as there was no witness testimony at the preliminary hearing. The PHO listed all the evidence he considered and attached the evidence to his report. The record of trial (ROT) contains all the recorded Article 32, UCMJ, preliminary hearing. In that sense the ROT is wholly complete.

Appellant and any reviewing court have access to all the evidence relied upon by the investigating officer and the ability to conduct a complete review of the case. The ROT contains all the recorded Article 32, UCMJ, hearing. In that sense, the ROT is wholly complete. We find that the unrecorded audio portion of the preliminary hearing is not a substantial omission that renders the record incomplete. Because it is an insubstantial omission, it does not raise a presumption of prejudice or affect the record's characterization as a complete one. *Henry*, 53 M.J. at 111.

In sum, the record of trial here is sufficient for counsel and this court to review Appellant's case on appeal. *See* R.C.M. 1116(b)(1), (A) (directing the certified record of trial and required attachments be provided to the Court of Criminal Appeals, and a copy to appellate defense counsel). Despite any error relating to the recording of the preliminary hearing, we were able to complete our Article 66(d), UCMJ, 10 U.S.C. § 866(d) review. *Cf. United States v. Reynolds*, No. ACM 40308, 2023 CCA LEXIS 407 (A.F. Ct. Crim. App. 28 Sep. 2023), at *2 n.4 (unpub. op.) (finding no prejudice from omission of a copy of the recording of the preliminary hearing).

## III. CONCLUSION

The findings and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court