# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

## No. ACM 40486

————————————

## UNITED STATES
*Appellee*

v.

## Adam J. SHERMAN
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 12 May 2025

————————————

*Military Judge*: Matthew P. Stoffel (arraignment and pretrial motions); Elijah F. Brown (trial); Nathan R. Allred (post-trial hearing).

*Sentence*: Sentence adjudged 16 March 2023 by GCM convened at Beale Air Force Base, California. Sentence entered by military judge on 23 May 2023: Dishonorable discharge, confinement for 13 years, reduction to E-1, and a reprimand.

*For Appellant*: Major Heather M. Bruha, USAF; Frank J. Spinner, Esquire.

*For Appellee*: Colonel Steven R. Kaufman, USAF; Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Major Jocelyn Q. Wright, USAF; Captain Heather H. Bezold, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, MASON, and KEARLEY, *Appellate Military Judges*.

Senior Judge RICHARDSON delivered the opinion of the court, in which Judge MASON and Judge KEARLEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

RICHARDSON, Senior Judge:

A military judge sitting as a general court-martial convicted Appellant, contrary to his pleas, of one specification of rape of a child in 2019 in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b.[1,2] The military judge sentenced Appellant to a dishonorable discharge, confinement for 13 years, reduction to the grade of E-1, and a reprimand.[3]

Appellant raises four assignments of error: (1) whether the finding of guilty is legally and factually insufficient; (2) whether the sentence to confinement is inappropriately severe; (3) whether relief is warranted because Appellant did not understand he had an opportunity to rebut post-trial victim matters prior to the convening authority's decision on action; and (4) whether trial defense counsel were ineffective when they "inexplicably failed to present favorable evidence at trial."[4] Also, though not raised as an assignment of error, we consider: (5) whether Appellant is entitled to relief for facially unreasonable appellate delay in accordance with *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006), or in the alternative, Article 66(d)(2). UCMJ, 10 U.S.C. § 866(d)(2).

We have carefully considered issue (3) and find it does not require discussion or relief. *See United States v. Guinn*, 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)).

As to the remaining issues, we find no error that materially prejudiced Appellant's substantial rights.

## I. BACKGROUND

EM testified about three instances when Appellant sexually abused her. Appellant was found guilty of the second instance of sexual abuse; the first and

---

[1] Unless otherwise noted, all references to the UCMJ, the Military Rules of Evidence (Mil. R. Evid.), and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant was acquitted of one specification of sexual abuse of the same child in violation of Article 120b, UCMJ, 10 U.S.C. § 920b.

[3] Appellant requested deferment and waiver of forfeitures to support his wife and children. The convening authority granted these requests.

[4] Appellant initially raised issue (4) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). Appellate defense counsel personally argued issue (4) in their reply brief.

third instances were not charged.[5] At the time of trial, EM was in sixth grade and still younger than 12 years.

EM lived with her father in Pennsylvania; her parents were divorced. EM's mother, AS, was married to Appellant. AS and Appellant lived near EM in Pennsylvania, then moved to California in 2018. The summer of 2018, Appellant and AS lived in base housing. Over the summer school break in 2019, EM stayed with AS, Appellant, and their three children in their home, a camper. In 2020, EM stayed with them not over the summer school break, but from August to October when she was enrolled in school online.

The first instance of sexual abuse EM detailed happened when she was around six years old, when Appellant and AS lived in Pennsylvania. Appellant told EM to get into the bed. Appellant rubbed some creamy substance "on [her] private area and with his mouth licked it." He also "touched [EM's] private area with his male part." Appellant and EM were unclothed from the waist down. Appellant told EM not to tell anybody, that it was their "secret."

 The second instance EM described was over a summer when EM visited AS and Appellant in California. For around ten days during this time, the family was vacationing at campgrounds in California; the other days they lived at a local campground. EM estimated she was seven or eight years old. One day in the camper, while her siblings were asleep and AS was out, Appellant asked, "Do you want to do our little secret?" Appellant removed EM's clothes from the waist down. Appellant got above[6] EM and "put his male parts in [EM's] lady private parts." EM was confused about what was happening. "It didn't really hurt, but it was just a very, like, weird feeling."

The third instance happened on a later visit to California. Appellant called EM into his bedroom and told her to remove her bottoms. He "began to touch [EM's vaginal area] with his male private parts and his hands," including putting his "boy part inside" EM. Appellant's mother entered the camper—but not the bedroom—briefly to drop something off, then left. Appellant told EM to put her clothes back on, and Appellant dressed himself.

EM clarified that both times in California, Appellant put his penis "more on the inside" of her vaginal canal than the outside, and that he did not ejaculate. EM testified her "eyes were probably closed for a majority of the time."

---

[5] The first instance was admitted pursuant to Mil. R. Evid. 414. It appears the Government charged the other instances as occurring in 2018 and 2019, but the evidence showed they occurred in 2019 and 2020. Appellant was found guilty of the specification with the time frame of "between on or about 1 January 2019 and on or about 31 December 2019."

[6] EM described Appellant as "crawling " and that "he got lower as he went."

After one of the instances in California, Appellant told EM not to tell anybody or she would not be able to go back to Pennsylvania to her dad.

Back in Pennsylvania, probably after the 2020 visit, EM and her father talked about her visit. She told her father that Appellant argued with her mother and yelled at the kids. EM's father asked whether Appellant ever hit or abused EM out of anger, and she said no. EM's father told EM that as long as she was safe out there, she would be going back the next summer.[7] Generally, EM looked forward to visiting her mother and siblings in California, but not Appellant.

Around February 2021, EM told her best friend XK what Appellant had done to her, but doubted XK "fully understood what [EM] told her."[8] XK thought EM used the word "rape." A few weeks later, at XK's bidding, EM told XK's stepmother CA, who, a couple months later, told EM's father and, in more detail, EM's stepmother. Within the month, EM underwent a child forensic interview and pediatric sexual assault examination—she was nine years old.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant claims the Government did not prove all the elements beyond a reasonable doubt. Asserting a lack of legal sufficiency and factual sufficiency, Appellant focuses on the date and location of the sexual act. Additionally, for factual sufficiency, Appellant focuses on the believability of EM and her description of events.

#### 1. Additional Background

CA was the first adult EM told about the abuse. CA testified about EM's demeanor: "You could see that she was upset. Her eyes were like glassed over. You could see that she was like getting teary-eyed and she was just pale." EM said to CA, "[Appellant] made me have sex." EM did not provide CA details; "[a]t that point [EM] broke down." Later, CA noticed "sex" and "what is sex" in XK's tablet history from February 2021.

EM's father testified about EM's bittersweet feelings towards her summers in California.

---

[7] EM's father thought he made the comments after her last return from California in October 2020.

[8] EM was not sure whether she told her best friend about Appellant's actions before or after her father made the comment about safety.

> She always desired to go to California to see her siblings because that was the one time of the year that she got to see them. And the same thing, she always desired, you know, to see her mom, and even the dog that was out there as well. Again, she always wanted to go, but the apprehension came at [Appellant's] . . . .

In response to questioning from trial defense counsel, EM's father stated, "There are still signs of trauma very frequently that occur with [EM]. So, I would say there are still long-lasting bits of trauma. I would say she's doing much better, but to say that there's no trauma would be absolutely false."

EM's stepmother testified about EM and Appellant. She remembered that in Pennsylvania when EM was around four years old, EM did not want to be dropped for visitation at AS's house when AS was not home but Appellant was. EM did not tell her stepmother why she was "scared" of Appellant. She also remembered that EM went to California in the summer of 2018, the summer of 2019, and the fall of 2020.

Dr. KM testified as an expert in the field of sexual assault forensic examination, as well as about her examination of EM. She found no physical evidence of sexual assault. She described the sensation from a touch to the hymen as "uncomfortable" to "painful," and that the hymen will repair itself, with no scar. She generalized that, "kids don't understand what inside means." She noted that a penis that is "not completely erect or hard . . . [is] not causing as much injury as an erect penis would."

AS testified for the Defense. She confirmed that EM visited them over the summer of 2019 when they lived in the camper. She claimed she "never" left Appellant alone with EM during any of the California visits, but conceded during these visits they may have been alone when she showered and slept. EM's father testified that he believed AS to be untruthful.

### 2. Law

"Under Article 66(d), UCMJ, [10 U.S.C. § 866(d),] the Court of Criminal Appeals conducts a de novo review of the record for legal sufficiency, factual sufficiency, and sentence appropriateness." *United States v. McAlhaney*, 83 M.J. 164, 166 (C.A.A.F. 2020) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free

from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). In resolving questions of legal sufficiency, we are "bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Bright*, 66 M.J. 359, 365 (C.A.A.F. 2008) (internal quotation marks and citations omitted). The evidence supporting a conviction can be direct or circumstantial. *See United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021) (citing Rule for Courts-Martial 918(c)) (additional citation omitted). "[A] rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element was proven. *Id.* at 369 (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). The "standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (internal quotation marks and citation omitted).

For this case, "[t]he test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

To convict Appellant of rape of a child, the Government was required to prove the following elements beyond a reasonable doubt: (1) that Appellant committed a sexual act upon EM; and (2) that, at the time of the sexual act, EM had not attained the age of 12 years. *See* 10 U.S.C. § 920b.(a)(1); *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 62.b.(1). For the alleged "sexual act," the Government had to prove Appellant intentionally touched, not through the clothing, EM's genitalia with the intent to gratify his own sexual desire. *See* 10 U.S.C. § 920b.(h)(1); *MCM*, pt. IV, ¶ 62.a.(h)(1).

### 3. Analysis

We start first with Appellant's legal and factual sufficiency claims relating to the date and location of the offense. We agree that EM did not appear to "know what years the two instances in California happened." Appellant asserted, "After being pressed, [EM] said the first of two instances of sexual abuse occurring in California happened in a camper the first or second summer she was visiting." Indeed, the first instance of abuse in California was the summer of 2019. This was the second summer EM visited California, but the first summer visit where they stayed in the camper. A review of the evidence in the light

most favorable to the Government makes clear that one instance of sexual abuse was in California in 2019—as alleged in Specification 2 of the Charge.

Next, we address Appellant's arguments for factual insufficiency. First, "the way [EM] described the alleged sexual assault does not follow common sense or the testimony of Dr. [KM]." We disagree. EM described Appellant getting above her before putting his penis into her vaginal area. That EM did not notice Appellant using any lubrication and did not feel pain is not inconsistent with the expert testimony presented, or common sense. As a young child, EM may not have understood how far "inside" her body Appellant could have gone. EM's description is consistent with shallow or flaccid penetration and no ejaculation.

We reject Appellant's other arguments. Appellant asserts "zero signs of grooming," which ignores testimony that EM's reluctance to be alone with Appellant started when she was in Pennsylvania, as well as EM's testimony that his abuse of her started in Pennsylvania. Appellant asserts EM lied so she would not have to live in a camper in California, but our review of the evidence shows EM still wanted to visit her mother and siblings in California. Appellant suggests that XK researched sex to help EM make a credible claim of sexual abuse. Instead, we can interpret this evidence to show two pre-pubescent girls trying to understand and put words to what EM experienced as a result of Appellant's actions.

Viewing the evidence produced at trial in the light most favorable to the Prosecution, we conclude a rational trier of fact could have found the essential elements of the convicted offense beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297−98. Furthermore, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we ourselves are convinced of Appellant's guilt beyond a reasonable doubt. *See Rodela*, 82 M.J. at 525.

**B. Sentence Severity**

Appellant contends that the sentence to "13 years' confinement—on top of a dishonorable discharge and [Appellant's] requirement to register as a sex offender—is inappropriately severe." Considering this Appellant and his offenses, we disagree.

**1. Additional Background**

In the presentencing proceedings, the Government presented a personal data sheet, six performance reports, three letters of counseling, and two letters of reprimand. EM presented a written unsworn statement. Appellant presented an Army Achievement Medal, four character letters, a photo presentation, and a written unsworn statement. No one testified in presentencing.

The Government argued the military judge should sentence Appellant to the mandatory dishonorable discharge, plus reduction to the grade of E-1 and "at least 20 years of confinement." Trial defense counsel argued for "an appropriate amount of confinement, no forfeitures, no reduction, and the mandatory dishonorable discharge." Trial defense counsel posited than an "appropriate" amount of confinement is that amount that would punish but also allow rehabilitation for reentrance as a productive member of society.

The military judge adjudged a dishonorable discharge, confinement for 13 years, reduction to the grade of E-1, and a reprimand.

**2. Law**

We review issues of sentence appropriateness de novo. *McAlhaney*, 83 M.J. at 167 (citing *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006)). Our authority "reflects the unique history and attributes of the military justice system, [and] includes . . . considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact. Article 66(d), UCMJ. In reviewing a judge-alone sentencing, we "must consider the appropriateness of each segment of a segmented sentence and the appropriateness of the sentence as a whole." *United States v. Flores*, 84 M.J. 277, 278 (C.A.A.F. 2024).

"We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citation omitted). Although the Courts of Criminal Appeals are empowered to "'do justice[ ]' with reference to some legal standard," we are not authorized to grant mercy. *United States v. Guinn*, 81 M.J. 195, 203 (C.A.A.F. 2021) (quoting *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010)). In the end, "[t]he purpose of Article 66[ ], UCMJ, is to ensure 'that justice is done and that the accused gets the punishment he deserves.'" *United States v. Sanchez*, 50 M.J. 506, 512 (A.F. Ct. Crim. App. 1999) (quoting *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988)).

The maximum punishment authorized for rape of a child includes, *inter alia*, confinement for life without eligibility for parole and forfeiture of all pay and allowances. *See MCM*, pt. IV, ¶ 62.d.(1). A dishonorable discharge is mandatory. *Id.* Article 58b, UCMJ, 10 U.S.C. § 858b, requires automatic forfeiture of all pay and allowances during a period of confinement when the sentence to confinement at a general court-martial is over six months.

A requirement to register as a sex offender is a collateral consequence of the conviction. *United States v. Palacios Cueto*, 82 M.J. 323, 327 (C.A.A.F.

2022) (quoting *United States v. Talkington*, 73 M.J. 212, 213 (C.A.A.F. 2014)). "The general rule concerning collateral consequences is that 'courts-martial [are] to concern themselves with the appropriateness of a particular sentence for an accused and his offense, without regard to the collateral administrative effects of the penalty under consideration.'" *Id.* (alteration in original) (quoting *United States v. Griffin*, 25 M.J. 423, 424 (C.M.A. 1988)).

### 3. Analysis

Echoing *Sothen*, 54 M.J. at 296, "In maintaining uniformity and even-handedness, [Appellant] asks this Court to rely on the judges' experience distilled from years of practice in military law to determine 13 years' confinement in this case is inappropriately severe and to reassess the sentence." Using our experience, we disagree; Appellant's sentence is not inappropriately severe. In making this determination, we apply the general rule that we do not consider the collateral consequence of sex-offender registration as an aspect of the adjudged sentence. *See Palacios Cueto*, 82 M.J. at 327.

In support of his position, Appellant cites much of the same evidence he offered during his sentence hearing. After conducting a thorough review of the entire record, specifically considering the Appellant, the nature and seriousness of the offense, Appellant's record of service, and all matters contained in the record of trial, we find Appellant's sentence is not inappropriately severe.

## C. Ineffective Assistance of Counsel

Appellant personally contends his trial defense counsel should have called AC, a family friend of Appellant and AS, as a defense witness. Specifically, Appellant contends his trial defense counsel should have followed up on an entry in the Air Force Office of Special Investigations' (OSI) report of investigation (ROI) where AC claims to have heard a motive for EM to lie.

Additionally, both Appellant and his appellate defense counsel contend trial defense counsel should have elicited testimony from AS about Appellant's busy work schedule at the time of the allegations. Appellate defense counsel also assert trial defense counsel should have retrieved Appellant's employment records.

Appellant submitted a declaration from AS in support of his claim regarding his employment history. Based on Appellant's allegations, trial defense counsel—Major (Maj) NA and Captain (Capt) MG—each submitted a declaration. We consider the declarations submitted by AS and trial defense counsel in addressing Appellant's claims on this issue. *See United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020). We determined a post-trial evidentiary hearing was required to resolve any factual disputes between AS's assertions and trial defense counsel's assertions. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967);

Article 66(f)(3), UCMJ, 10 U.S.C. § 866(f)(3). In our order directing the post-trial hearing, we stated, "Appellant may file a brief addressing the military judge's findings of fact," and authorized the Government to respond to any such brief. After the hearing, Appellant and the Government each submitted a brief. We do not address matters in the briefs that go beyond the scope of our order to the military judge and his findings of fact thereon.

We find Appellant has not overcome the presumption of competent defense counsel.

### 1. Law

The Sixth Amendment[9] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). "In determining whether an attorney's conduct was deficient we do not simply ask whether the attorney did everything possible that posed little or no risk to the client." *Palacios Cueto*, 82 M.J. at 329. "[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 689) (additional citation omitted). We consider the following questions to determine whether the presumption of competence has been overcome: (1) is there a reasonable explanation for counsel's actions; (2) did defense counsel's level of advocacy fall measurably below the performance ordinarily expected of fallible lawyers; and (3) if defense counsel were ineffective, is there a reasonable probability that, absent the errors, there would have been a different result. *United States v. Palik*, 84 M.J. 284, 289 (C.A.A.F. 2024) (citing *Gooch*, 69 M.J. at 362). When considering the last question, "some conceivable effect on the outcome" is not enough; instead, an appellant must show a "probability sufficient to undermine confidence in the outcome." *Datavs*, 71 M.J. at 424 (internal quotation marks and citations omitted).

"[O]ur scrutiny of a trial defense counsel's performance is 'highly deferential,' and we make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

---

[9] U.S. CONST. amend. VI.

evaluate conduct from counsel's perspective at the time.'" *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (omission in original) (quoting *Strickland*, 466 U.S. at 689). The burden is on the appellant to identify specific unreasonable errors made by his or her defense counsel. *United States v. Brownfield*, 52 M.J. 40, 42 (C.A.A.F. 1999) (citing *Strickland*, 466 U.S. at 689). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475 (citation omitted). "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *Datavs*, 71 M.J. at 424 (citations omitted). Counsel's advice to an accused, or counsel's "strategic" or "tactical" decision that is unreasonable, or based on inadequate investigation, can provide the foundation for a finding of ineffective assistance. *See Davis*, 60 M.J. at 474–75.

### 2. Additional Background and Analysis

#### a. Witness AC

During its investigation, OSI interviewed AC. This excerpt appears in OSI's summary of AC's statement:

> [AC] overheard [AC's son] ask [EM] about the allegations against [Appellant]. [AC] questioned if [EM] said the allegation to avoid traveling to [California (CA)] and [EM] replied her "friend" [no further information] told [EM] if she went to CA for the summer they would not be able to be together during the summer. [EM] then began to backtrack and deflect [AC's] questions.

AC testified on the defense motion to exclude Mil. R. Evid. 404(b) evidence. She testified about her relationship with Appellant, AS, and their children, and about Appellant's interactions with her children and AS's children. AC was not called as a witness on the merits or in pre-sentencing; however, AC provided a character letter for Appellant.

Through several witnesses, the Defense elicited testimony suggesting EM wanted to avoid going to California and, to that end, concocted the allegations against Appellant. For example, they brought out the following: when EM was in California over the summer, she would be away from her best friend XK in Pennsylvania; the camper was hot and cramped, whereas EM had her own bedroom at home; in California EM had only one friend her own age, whom she saw sporadically, and had some responsibility for her young siblings; and Appellant and AS's parenting style was stricter than EM's father's.

In his brief to the court, Appellant claims that

> [w]ith respect to [AC], defense counsel had a clear duty to inter-view [AC] about the OSI ROI entry summarizing [AC's] inter-view in which she spoke to [EM] about [EM's] reason for not wanting to visit California during the summer. This would have further substantiated EM's motive to come up with a sexual assault claim in order to avoid any future potential visit to Califor-nia.

In her declaration to this court, Capt MG indicates she interviewed AC twice before trial, the second time also with Maj NA. Capt MG said both inter-views yielded the same information.

> [W]hen the Defense asked about whether [EM] ever disclosed to [AC] whether she either disliked visiting California or didn't want to spend her summers there, the Defense was provided with evidence to the *contrary*. In particular, [AC] informed the Defense that in her last conversation with [EM] *in 2021*, [EM] had expressed *excitement* and a *strong desire* to come back out to California in order to see her half-siblings and always seemed happy visiting the Shermans.[10]

The fact that EM wanted to return to California cuts both ways: EM wanted to go back to California, not avoid it, but it would mean going back to a person who sexually assaulted her. We find trial defense counsel provided a reasona-ble explanation for not presenting testimony from AC about whether EM de-sired to go to California. Moreover, we see no reasonable probability that, ab-sent the claimed error, there would have been a different result. *Palik*, 84 M.J. at 289. The presumption of competence has not been overcome. *Id.*

### b. Witness AS

Appellant's wife, AS, testified about how EM was never alone with Appel-lant. On direct examination by trial defense counsel, AS testified that she was "a stay-at-home mom" in 2018 and 2019. Additionally, Appellant's mother, NS, usually would accompany EM on her visits to California. AS agreed NS was a "constant presence" and the adult with whom she would leave the children when AS left the home without them.

Appellant asserts trial defense counsel should have examined AS during trial about Appellant's "limited opportunities . . . over a 39-day period in which he could have engaged in a sexual assault upon [EM]." Appellate defense coun-sel argue: "From her personal knowledge, [AS] could have testified in detail

---

[10] Maj NA's declaration uses these same words, only with different emphasis.

about [Appellant's] Air Force and civilian work schedules had she been appropriately prepared by trial defense counsel. It would have been counsel's decision whether to offer corroborating evidence in the form of documents or text messages."

In her declaration to this court, AS states EM visited them for 39 days in the summer of 2019. "Had I been asked by the defense counsel I could have supplied very detailed information covering our family activities every day during that period, including documents and records that would have objectively corroborated my testimony." Appellant did not submit these documents or records, and AS does not further describe them. AS also states:

> I also could have supplied details about [Appellant's] work schedules in the Air Force and at [F] Motors, his off-duty civilian employment. I have records that would have corroborated my testimony. His work hours from 27 July to 13 August typically ran from the morning at [F], followed by reporting to Beale AFB at 2:30 pm and working late into the evening.

AS did not assert in her declaration that she ever told trial defense counsel that Appellant worked for F Motors. She ends her declaration:

> I cannot explain why the defense counsel did not seek this more detailed information and records. It would have been extremely easy to sit down with them and a calendar to go over every day of the 39-day period. I could have accounted for our daily activities with photographs, text messages, receipts and other documents that demonstrated what campgrounds we were in, how long it would have taken [Appellant] to travel to and from his work locations and timing.

AS did not assert she told trial defense counsel that she had such a calendar. In summary, AS contends that she had detailed documentation showing Appellant was not at the camper with EM at the time of the sexual assaults, and Appellant's trial defense counsel should have asked her for it.

Both Maj NA and Capt MG wrote at length in their declarations about their efforts to gather favorable evidence from Appellant and AS. They detail the times they asked Appellant and AS to provide them any evidence relating to the issues in the case. Capt MG stated:

> I even asked them to make a timeline showing when [EM] was visiting and when [AS] and [NS] were present as well as [Appellant's] work schedule at the time of [EM's] visits, in order to show when [Appellant] would (or more importantly would not have) had the opportunity to commit[ ] the alleged offenses. Both Maj [NA] and I repeatedly requested such evidence, whether as

testimony from [AS], or documentary evidence. We never received any of that.

Maj NA summarized the Defense's efforts to get favorable evidence from Appellant and NS:

> From the very beginning of our representation of [Appellant], we requested that he and his wife provide us with *any* and *all* evidence that could've possibly existed that would've supported his claim of innocence at trial. Based on these conversations and the responsive documents and information provided to us, the Sherman's [sic] clearly understood this tasker and were ultimately the primary source of the evidence that the Defense utilized at trial. Stated differently, there was never any objective indicators to either myself [or] Capt [MG] that the Sherman's [sic] were in possession of the additional evidence that [AS] now claims was so readily available. While it is undisputed that Capt [MG] and I had a duty to investigate in preparation for trial, that duty does not require either of us to be clairvoyant about evidence that would've corroborated [AS's] testimony, especially when we had no objective indication that said evidence existed, if it exists as [AS] now maintains at all.

(Footnote omitted).

The military judge who conducted the fact-finding hearing this court ordered pursuant to *DuBay* and Article 66(f)(3), UCMJ, issued a five-page "*DuBay* Hearing - Findings of Fact" (Findings of Fact). The military judge found that Appellant's area defense counsel asked Appellant to provide "evidence that might be helpful in his case," "even if he did not think it was a big thing," and Appellant's senior defense counsel asked Appellant to provide "everything he possibly could related to the case." The military judge found that "[t]rial defense counsel had similar conversations with [AS] about the Appellant's case."

As to what was requested and provided, the military judge found: "Trial defense counsel asked [AS] for information about the daily interactions between the Appellant and EM" and discussed "EM's biological father . . . and [Appellant and AS's] other children." "Appellant and/or [AS] provided a bill of sale for their camper, a video showing the layout of their camper, [AS's] Air

Force enlistment contract, a binder[11] of documents related to EM and her trip to California, and the cell phone EM used when visiting California." (Footnotes omitted).

Regarding Appellant's employment, the military judge found: "Trial defense counsel asked the Appellant about his work schedule during the time period EM was visiting, to include asking about his employment at [F] Motors." "The Appellant told trial defense counsel that, during the time EM was visiting, he worked at [F] Motors in addition to being in the Air Force. The Appellant provided trial defense counsel the names of his employers at [F] Motors – Mr. and Ms. [M]. Appellant did not provide trial defense counsel with his work schedule." (Footnote omitted). "Trial defense counsel and [AS] also discussed the places where the Appellant was employed. [AS] responded to questions she was asked but did not offer additional information about the Appellant's schedule or whereabouts."

The military judge found that AS met with trial defense counsel "on several occasions" to discuss Appellant's case. AS had their contact information. "Trial defense counsel never refused to talk to [AS]." "Trial defense counsel accepted every piece of evidence [AS] offered them; trial defense counsel never refused any offer of evidence from [AS]."

Appellant has not demonstrated deficient performance of counsel regarding AS and Appellant's employment at F Motors. In her declaration, AS blames trial defense counsel for not getting from her "records" and "details about [Appellant's] work schedules in the Air Force and at [F] Motors, his off-duty civilian employment." However, trial defense counsel asked both Appellant and AS for any evidence that might help Appellant's case, and specifically asked Appellant about his employment at F Motors and asked AS about Appellant's places of employment. Appellant did not provide his trial defense counsel with his work schedule from F Motors. Appellant claims his trial defense counsel should have retrieved Appellant's employment records, and failure to do so was deficient performance. From our review of the record, however, it appears Appellant's trial defense counsel asked Mr. and Mrs. M about Appellant's employment history, but they did not—and perhaps could not—provide records. Even if we found deficient performance, we find no prejudice.

To determine prejudice, we ask whether, absent the claimed error, there is a reasonable probability that there would have been a different result. *See Palik*, 84 M.J. at 289. Even after a fact-finding hearing, the record provides no

---

[11] The military judge found: "Trial defense counsel was also in receipt of a binder with over one hundred pages of information related to flight itineraries for EM's trip to California, campsite reservations for the summer of 2019, pictures, and copies of various text message conversations related to EM." (Footnote omitted).

indication that Appellant's work schedule at F Motors would have provided an alibi defense or otherwise tended to show Appellant could not have committed the charged offense. The record shows that over several days in the summer of 2019, Appellant and his family were together, vacationing in the camper, with NS nearby, which is consistent with EM's memory of the rape. Appellant has not shown a "probability sufficient to undermine confidence in the outcome." *Datavs*, 71 M.J. at 424 (internal quotation marks and citations omitted).

## D. Timeliness of Appellate Review

### 1. Law

"[C]onvicted service members have a due process right to timely review and appeal of courts-martial convictions." *Moreno*, 63 M.J. at 135 (citing *United States v. Toohey*, 60 M.J. 100, 101 (C.A.A.F. 2004); *Diaz v. Judge Advocate General of the Navy*, 59 M.J. 34, 37–38 (C.A.A.F. 2003)). Whether an appellant has been deprived of his due process right to speedy post-trial and appellate review, and whether constitutional error is harmless beyond a reasonable doubt, are questions of law we review de novo. *United States v. Prasad*, 80 M.J. 23, 29 (C.A.A.F. 2020) (citation omitted); *United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F. 2011) (citing *Moreno*, 63 M.J. at 135).

A presumption of unreasonable delay arises when appellate review is not completed, and a decision is not rendered within 18 months of the case being docketed. *Moreno*, 63 M.J. at 142. A presumptively unreasonable delay triggers an analysis of the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (additional citations omitted). *Moreno* adopted three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of a convicted person's grounds for appeal and ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or the appellant." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533 ("Courts must still engage in a difficult and sensitive balancing process.")). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

A Court of Criminal Appeals may provide appropriate relief for excessive post-trial delay. Article 66(d)(2), UCMJ. Appropriate relief is not synonymous with meaningful relief. *United States v. Valentin-Andino*, __ M.J. __, No. 24-0208, 2025 CAAF LEXIS 248, at *7 (C.A.A.F. 31 Mar. 2025). "Although it is within a Court of Criminal Appeals' discretion to place its reasoning about Article 66(d)(2) relief on the record, it is not required to do so." *Id.* (citing *Winckelmann*, 73 M.J. at 16).

### 2. Procedural Background and Analysis

Appellant's case was docketed with the court on 28 June 2023. The delay in rendering this decision after 28 December 2024 is presumptively unreasonable. The reasons for the delay include: the time required for Appellant to file his brief, which was filed with this court on 24 June 2024; the time required for the Government to obtain affidavits then file its answer on 12 September 2024; the time required to complete the fact-finding hearing ordered on 24 October 2024, with findings of fact dated 24 February 2025; and the time required for both parties to file their briefs regarding that hearing.[12] Appellant has made no specific assertion of his right to timely appellate review, nor claimed prejudice on this issue, and we find none. Because we find no particularized prejudice, and the delay is not so egregious as to adversely affect the public's perception of the fairness and integrity of the military justice system, we likewise find no due process violation. *See Toohey*, 63 M.J. at 362.

We also conclude there is no basis for relief under Article 66(d)(2), UCMJ, in the absence of a due process violation. Considering all the facts and circumstances of Appellant's case, we decline to exercise our Article 66(d), UCMJ, 10 U.S.C. § 866(d), authority to grant relief for the delay in completing appellate review.

### III. CONCLUSION

The findings and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

---

[12] Notably, Appellant filed for and was granted nine enlargements of time permitting his appellate defense counsel a full opportunity to review the case and submit Appellant's brief.

Accordingly, the findings and the sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court